**STATE of Tennessee, Appellee,**

v.

**Ella ENSLEY and James Scott McCulley, Appellants.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Oct. 4, 1996.

Permission to Appeal Denied by Supreme Court April 14, 1997.

Charles M. Corn, District Public Defender, A. Wayne Carter, Mack McCoin, Asst. Public Defenders, Cleveland, for Appellant Ensley.

Conrad Finnell, Cleveland, William W. Reedy, Athens, for Appellant McCulley.

Charles W. Burson, Attorney General and Reporter, Jerry L. Smith, Deputy Attorney General (former), Criminal Justice Division, Nashville, Jerry N. Estes, District Attorney General, Rebble Johnson, Asst. Dist. Attorney General, Cleveland, for Appellee.

## OPINION

SUMMERS, Judge.

At a joint trial, the appellants, Ella Ensley and James Scott McCulley, were each convicted of two counts of first degree murder. Appellant McCulley was also convicted of two counts of attempted second degree murder. Ensley received two consecutive life sentences. McCulley was sentenced to life without parole in the first degree murder convictions and to consecutive thirty-year sentences in the attempted second degree murder convictions.[1] From these convictions and sentences both appeal.

Appellant Ensley argues that:

---

1. We note that the state sought the death penalty as to appellant McCulley.

1. Her case should not have been consolidated with the case of appellant McCulley;
2. The trial court erred when it allowed into evidence her statement made to Deputy Davis;
3. The trial court should have dismissed the case against her because the state failed to prove the allegations contained in the bill of particulars;
4. The evidence was insufficient to support the verdict;
5. The trial court erred in ordering two consecutive life sentences.

Appellant McCulley claims that the trial court erred in: (1) overruling his motion to suppress the evidence found in a Crown Royal whiskey bag; and (2) ordering consecutive sentences. Following our review, we affirm the conviction and sentences of both appellants.

## FACTS

The testimony at trial revealed that on the evening of December 28, 1993, a woman phoned the Cleveland, Tennessee 911 department.[2] She told the operator that there was a dead man in Park Terrace Apartment number 94. Officers Barry Tharpe and Craig Hamilton responded to the call. As they started up the flight of stairs leading to the apartment, they smelled a strong odor. When Officer Tharpe received no response from his knocking, he opened the door which was slightly ajar. He saw two bodies which appeared to have been dead for several days. The officers closed the door and secured the premises.

Detective Tony Alvarez of the major crimes unit arrived on the scene. Alvarez found two bodies in the living room. A female was sitting on the couch while a male was slumped over in the floor in front of the couch. Investigators determined that the bodies had been there from two to seven days. The male victim had been shot twice in the head. The female had a gunshot wound to her chest and three to her head. Shell casings from a .25 caliber automatic were found on the floor near the bodies. The investigators determined that all the shots had been fired at close range. The television had not been turned off, and the entertainment center had been ransacked. A partially eaten turkey was still in the oven and a pie was on the counter. Further investigation revealed that the bedroom drawers had been ransacked.

The victims were identified as Randall Ensley and Diane McKheen. Victim Ensley was the ex-husband of the appellant Ensley and Ms. McKheen was Randall Ensley's fiancé. Appellant Ensley and her boyfriend, appellant McCulley became suspects early into the hours of the following morning. After talking with state witnesses, Deputy Chief Anthony Benefield drove past a house belonging to the Jefferys where he had been told he might find the appellants. Benefield assumed they were awake when he saw lights on and movement throughout the home. He called for Captain Bryant to meet him at the Jeffery residence for the purpose of questioning McCulley. Shortly thereafter, Bryant and Officers Ken Poteet, Phil Matthews and Mike Boggess arrived at the house.

The five officers approached the front porch of the Jefferys' residence where they were met by Mr. Jeffery. Benefield asked Jeffery if either appellant was inside the house. Mr. Jeffery said they were not and asked Benefield if he had a warrant. Benefield responded that they did not. When Ms. Jeffery came to the door, Benefield asked her if the appellants were inside to which she replied, "No, come on and look." When Officer Bryant pushed open a bedroom door, McCulley jumped out the back window. The officers pursued McCulley who began firing upon them. The officers returned fire, wounding McCulley. McCulley threw or dropped a Crown Royal whiskey bag which was retrieved by Benefield and secured in

**2.** Chip Bryant later testified that he conducted two voice tests of Appellant Ensley on January 5, 1994, for the purpose of comparing Ensley's voice with that of the voice on the previously mentioned 911 tape. Appellant Ensley denied that she made the 911 call; however, a witness testified that she recognized the tape as Ensley's voice. Ensley also later admitted that she made the call.

the trunk of his car. The bag contained a knife, money, and a ring later determined to belong to one of the victims.

McCulley was taken to the hospital. T.J. Jordan, a TBI special agent, interviewed McCulley at the hospital. When asked what happened, McCulley said that the police had shot him because he had shot at them. Agent Brooks Wilkins, also an investigator with the TBI, spoke with McCulley at the hospital on January 4. Before the discussion began, Agent Brooks read McCulley his rights. In a sworn statement, McCulley gave his version of the police shootout and described his activities on the days surrounding the murders. McCulley said he could not remember what he did on Christmas day. On Christmas evening, he and Ensley got a room at the Diplomat Motel. He said he and Ensley were together the entire night. McCulley added that initially he did not get along with the victim, Randall Ensley; but that soon thereafter Ensley accepted McCulley's relationship with appellant Ensley. McCulley said he had never been to Randall Ensley's home.

Following his meeting with McCulley, Agent Jordan interviewed Ensley, who had been taken into custody for questioning, at the Bradley County Sheriff's Office. Prior to Jordan's arrival, Ensley was placed in the interview room where she was accompanied by Deputy Darlene Davis. Though Davis was merely a custodian of Ensley, Ensley began to talk to her. Ensley told Davis that she would always love Randall Ensley. She also said, "we went . . . by the apartment . . . and his van . . . was there." The appellants were not charged with the murders until January 11, 1994. Appellant McCulley was also charged with attempted first degree murder for his conduct surrounding the police shootout.

A number of other witnesses testified as to various statements the appellants had made prior to and following the murders. Lisa Brown, appellant Ensley's daughter and stepdaughter of the victim, Randall Ensley, said that McCulley was jealous of her stepfather. She said that her grandfather had asked her to call the company where her stepfather worked and ask for the identity of the beneficiary on his life insurance policy. Randall Ensley had spoken of the policy and whether his father or his child should be listed as the beneficiary. However, Randall Ensley's employer indicated that Randall Ensley's father was the named beneficiary. Brown explained that on Christmas day, she, her two small children, Randall Ensley's father and Ms. McKheen's father had gone to the victims' apartment for Christmas dinner. After dinner, Ensley and McKheen had driven the family members back home in their van. As soon as they arrived home, appellant Ensley simultaneously arrived.

Brown further testified that after the shootout at the Jeffery residence, Ms. Jeffery brought her a jacket belonging to appellant Ensley. Inside the jacket she found three rings: a black onyx ring, an engagement ring, and a pinkie ring. Linda Carol Price, McKheen's sister, later testified that McKheen owned a black onyx ring and a diamond cluster ring. Brown gave these rings to her uncle, George Eady. She said that one of the rings looked like Diane McKheen's ring.

Jessie Jeffery, owner of the home where the shootout occurred, testified that appellant McCulley told him of the shootings on December 26. McCulley told Jeffery that he and Randall Ensley were talking that night. When Ensley bent over to sip on some tea, McCulley shot him. When Diane McKheen appeared from the other room, McCulley shot her, too. Jeffery added that McCulley said that after he shot Ensley, McKheen pleaded with him not to shoot her. McCulley told Jeffery that he threw the murder weapon into Watts Bar. Appellant McCulley also said that he returned to the scene of the murders two or three times to make it look like a robbery. He told Jeffery that he knew there were some guns and money in the apartment.

Appellant Ensley testified on her own behalf. Ensley said that about 4:00 p.m. on Christmas day, Randall Ensley and Diane McKheen came to her house to pick up the children. Appellant Ensley took a shower and rented a room at the Diplomat Motel for some "peace and quiet and privacy." On cross-examination, Appellant Ensley said she

had not planned an evening with McCulley even though she had registered at the Diplomat Motel for two people. Later, Ensley and McCulley stayed at the motel for a short time before she went back to her house. Randall Ensley was unloading the children as she arrived at approximately 9:00 p.m. Appellant Ensley said she stayed at the house for about an hour and went back to the motel.

Appellant Ensley said that McCulley left the motel room to purchase beer at which time she called Randall Ensley's father to wish him a "Merry Christmas." Ensley said that McCulley was gone about thirty minutes. Upon his return, McCulley drove Ensley to Athens, Tennessee to visit Dean Stafford, McCulley's aunt. After an hour visit, they returned to the motel room.

Appellant Ensley described her relationship with Randall Ensley as "okay." She said that although she had initially been upset about Randall's relationship with McKheen, she was no longer disturbed by it. Ensley admitted that she made the 911 call because McCulley had told her he had killed Randall Ensley. Ensley said her first knowledge of the murder came at the Jeffery residence when McCulley was drinking. He told her, "I done (sic) something bad," "I killed Randy." When asked about the rings found in her jacket, which had been left at the Jeffery residence, appellant Ensley responded that they had been given to her by McCulley before he told her about the shootings.

McKheen's sister, Linda Carol Price, said that she spoke with the victim McKheen on Christmas eve about appellant Ensley. Price indicated that McKheen had told her that appellant Ensley had been threatening and harassing her. McKheen called Ensley a "bitch." Apparently, McKheen had even told appellant Ensley where she lived and that if she was going to do something "come and do it."

Joe Mantooth, who worked with Randall Ensley for eight years, said that he knew of occasions when Randall gave appellant Ensley money after the divorce. On one occasion, Mantooth loaned Randall the money to buy appellant Ensley a car when she wrecked hers. Two weeks before Thanksgiving 1993, Randall Ensley told Mantooth that he had begun dating Diane McKheen. When Mantooth asked Randall, "What about Ella?" Randall replied, "To hell with the bitch."

Frank Harmon, another co-worker and friend of Randall Ensley, said, in discussions about appellant McCulley, that Ensley had told him he hated the "S.O.B." One night Harmon drove Ensley home to Park Terrace. Ensley told him he did not want anyone to know where he lived. Ensley also said just before Thanksgiving that before "it" was over, one of them [Ensley or McCulley] would be dead.

Walter Eady, appellant Ensley's brother, had a conversation with Randall Ensley about additional life insurance approximately four months before Christmas. Randall was inquiring as to whether he should list appellant Ensley or the children as beneficiaries. Eady suggested that he put it in the children's names. On cross-examination, Eady admitted that maybe he had made a statement to Lisa Brown, appellant Ensley's daughter, that if she ever got any money to remember him.

Brenda Eady, appellant Ensley's sister-in-law, testified that about two months before Christmas, appellant McCulley told her that he was planning to kill Randall Ensley for the insurance policy. He told her that he would wait a couple of months, however, for the insurance policy to go into effect.

Shelia Jeffery, appellant McCulley's cousin, spoke of a conversation she had with appellant Ensley. During that discussion, Ensley said that Randall had adopted appellant Ensley's son, Michael, and that Michael was Randall's only heir. As such, everything he owned was in Michael's name if anything happened to him. This included an insurance policy. Jeffery also spoke by telephone with McCulley on Christmas night at approximately 9:00 p.m. She said he phoned from a room at the Diplomat Motel and wanted Jeffery and her husband to take McCulley and Ensley to Athens. Jeffery thought she heard appellant Ensley in the background during the conversation. When Jeffery said they would not drive the two to Athens,

McCulley phoned again approximately an hour later with the same request. After Christmas, but before the later police shootout at the Jeffery's residence, appellant Ensley told Jeffery that she threw a gun off the 58 Bridge because it had her fingerprints all over it. Appellant Ensley said she hoped it [the gun] was not found. Jeffery also had a conversation with McCulley after Christmas during which he said he had done something bad and that they would know it when they saw the news. About two days before the shootout, McCulley said that he was not going to jail. After the shootout, Jeffery took appellant Ensley's jacket to Ensley's daughter. Finally, Jeffery told of an occasion when appellant Ensley was in her home. Ensley had Jeffery telephone Diane McKheen and call her a bitch.

Michael Ensley, appellant Ensley's son, testified that between Thanksgiving and Christmas of 1993, he overheard a conversation between Ensley and McCulley in which McCulley said, "I'm gonna kill Randy." Michael, Lisa Brown, and Johnny Atkins were present when Sheila Jeffery brought Ensley's jacket to them. They went through the jacket pockets and found a pill bottle containing a black onyx ring, a gold pinkie ring and a diamond cluster ring which Lisa Brown took. They also found a knife which Johnny Atkins took. On cross-examination, Michael replied that McCulley was the dominant one in the relationship with appellant Ensley.

Johnny Atkins, Lisa Brown's boyfriend, testified that about two weeks before Christmas, appellant Ensley told him that "one day I'll be wearing Diane's rings." Ensley warned Atkins that if he told anyone what she had said she would know who told. Atkins was also present when Jeffery brought Ensley's jacket to them. Atkins said that Chris gave him the knife that was in the pocket of the jacket.

Lynn Hamilton, McCulley's cousin, had a conversation with McCulley about Randall Ensley. He told Hamilton that he did not like Randall Ensley because he was causing trouble between him and Ella Ensley. McCulley said he would like to whip Randall Ensley. Hamilton saw both appellants on Christmas night between 9:30 and 10:00 p.m.

at his apartment in Athens which is approximately 34 miles from Park Terrace Apartments. On Christmas night, McCulley gave Hamilton an Uncle Henry knife. Hamilton thought both appellants seemed nervous and, though both were described as talkers, neither had much to say. Hamilton, who saw McCulley with two handguns after Christmas but before the shootout, said that McCulley told him he was "gonna go out shooting" and would not go back to jail.

Dean Stafford, McCulley's aunt, was given a heart-shaped ring by appellant Ensley a couple of days after Christmas and told not to get rid of it. However, on December 31, 1993, appellant Ensley told Stafford to get rid of it.

## I. CONSOLIDATION OF TRIALS

■ Appellant Ensley's first issue is that the trial court erred in consolidating her case with appellant McCulley's case. Joinder is permissible when each defendant "is charged with accountability for each offense included." Tenn.R.Crim.P. 8(c)(*l*). A trial judge may, however, grant a severance prior to trial if "it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn.R.Crim.P. 14(c)(2)(i) & (ii). Whether to grant a severance is within the trial judge's sound discretion. *State v. Coleman,* 619 S.W.2d 112, 116 (Tenn.1981). The exercise of that discretion will not be reversed absent an affirmative showing of prejudice.

Appellant Ensley claims she was prejudiced by: (1) the denial of a speedy trial; (2) her inability to prove McCulley's prior criminal record and to have McCulley testify in her behalf; and (3) being tried by a "death-qualified jury."

### A. Speedy Trial

■ Appellant Ensley's first basis of prejudice is that the consolidation of the trials resulted in the denial of her right to a speedy trial. In determining whether a defendant has been denied the constitutional right to a speedy trial, our Supreme Court, in *State v. Bishop,* 493 S.W.2d 81 (Tenn.1973), adopted the four-part test outlined in *Barker*

*v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We must consider the following four factors:

1. the length of the delay;
2. the reasons for the delay;
3. the defendant's assertion of a right to a speedy trial; and
4. whether the defendant was prejudiced by the delay.

*Bishop,* 493 S.W.2d at 83–84. While no single factor is determinative, the most crucial inquiry is whether the delay has prejudiced the defendant. *Tillery v. State,* 565 S.W.2d 509 (Tenn.Crim.App.1978).

■ The length of the delay was approximately eleven months and is primarily attributable to the joint trial. This relatively modest delay does not, in itself, support appellant's claim of denial of a speedy trial. This Court has previously held that a two-year delay, standing alone, does not violate the right to a speedy trial. *State v. Bishop,* 493 S.W.2d at 84. Further, it is undisputed that appellant Ensley filed a motion for a speedy trial on May 4, 1994. As to the prejudice factor, the appellant argues that had the trial been severed, she would have proceeded to trial within two months. She claims due to the delay she was prejudiced in that her lengthy stay in the county jail affected the way the jury perceived her "general appearance in the courtroom" and her demeanor on the witness stand. No claim is made that she was impaired in her ability to prepare a defense.

■ Having reviewed the pleadings and events occurring prior to the trial, we find no support for this claim. Further, appellant's bald assertions that the lengthy stay affected her courtroom appearance are unsupported by proof. Thus, this issue is without merit.

## B. Antagonistic Defenses

As her next basis, appellant Ensley argues that a severance should have been granted because at the joint trial she was unable to refute the state's position that she manipulated appellant McCulley. Specifically, she contends that she was prejudiced by: (1) her inability to bring McCulley's prior criminal record before the jury; (2) the inability to admit certain statements made by her, McCulley and a third party witness, which would have been admissible in a separate trial; and (3) the inability to call appellant McCulley as a witness at the joint trial.

■ "While 'mutually antagonistic' defenses may mandate severance in some circumstances, they are not prejudicial per se." *State v. Farmer, et al.,* No. 03C01—9206—CR—00196, 1993 WL 247907 (Tenn.Crim. App. July 8, 1993) citing *Zafiro v. United States,* 506 U.S. 534, 537–38, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993). Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. *Id.* Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. *Id.* "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." *Id.* quoting *United States v. Horton,* 705 F.2d 1414, 1417 (5th Cir.1983).

■ In subissue one, appellant Ensley claims that a separate trial would have permitted her to mention McCulley's prior criminal record to rebut the state's theory that she was a manipulator. However, as the state argues, McCulley's record would not have been admissible to prove his character as a "hardened criminal." Tenn.R.Evid. 404(b). The criminal records could have been used as impeachment evidence at a separate trial under Tenn.R.Evid. 609; however, it is unlikely that the defense would want to impeach their "star" witness. We find no prejudice due to the exclusion of McCulley's prior record.

■ The appellant's second subissue asserts she was prejudiced by the trial court's decision to redact a portion of her statement. Her argument, however, is not supported by appropriate references to the record. Tenn. Ct.Crim.App.R. 10(b). Notwithstanding waiver, the redacted evidence was admitted via the appellant's testimony. Accordingly, the appellant cannot demonstrate prejudice.

■ Finally, within this argument, appellant claims that at a separate trial she could have called McCulley to testify in her behalf. It appears that McCulley signed an affidavit indicating his willingness to testify for Ensley. The transcript indicates that the trial court and counsel had a lengthy discussion regarding McCulley's offer to testify. However, as the trial judge reasoned, there was no guarantee that McCulley would follow through on his commitment. With Ensley being tried first, McCulley would have had to incriminate himself. Had his counsel's advice been the same as that of the joint trial, McCulley likely would have refused to testify. As pointed out by the state, Ensley's counsel thought it futile to call appellant McCulley at the joint trial (knowing he would assert his privilege against self-incrimination). Nonetheless, we will not speculate as to whether he would have testified at a separate trial. Instead, we find no showing of "compelling prejudice" under any of the subissues. This issue is without merit.

### C. "Death–Qualified Jury"

Appellant Ensley claims that because she faced the same jury as appellant McCulley, against whom the death penalty was sought, she was denied her right to a representative jury under the Fourteenth and Sixth Amendments to the United States Constitution. Additionally, she claims that this procedure gave the state challenges for cause not provided by law in a non-capital case in violation of Tenn.R.Crim.P. 24. We disagree.

In *State v. Harbison*, 704 S.W.2d 314, 318 (Tenn.1986), the Supreme Court considered the defendant's contention that he was denied the right to a fair trial by the "systematic exclusion of prospective jurors who were against the death penalty." However, citing *State v. McKay*, 680 S.W.2d 447, 450, 453–55 (Tenn.1984) and *State v. Zagorski*, 701 S.W.2d 808 (Tenn.1985), the Court rejected the argument that excluding such jurors denies the defendant a jury composed of a representative cross-section of the community. *See also State v. Holliday, et al.*, No. 28, 1987 WL 9448 (Tenn.Crim.App. Apr. 15, 1987, Jackson) (holding that a "death-qualified" jury does not result in the denial of

defendant's constitutional rights to a jury that represents a cross-section of the community).

Likewise, we find no merit to the appellant's complaint that the state received challenges for cause not provided by law in a non-capital case in violation of Tenn. R.Crim.P. 24. Appellant Ensley neither cites authority to support her position nor demonstrates how she was prejudiced. This issue has no merit.

In summary, we take notice of the lengthy discussions between the trial court and counsel on this topic. Only after much analysis did the trial judge deny the motion to sever. Even then, the judge acknowledged his willingness to grant a severance at a later time should the circumstances dictate. We find no abuse of discretion in the trial judge's denial of the motion to sever.

### II. MOTIONS TO SUPPRESS

Both appellants claim that the trial judge should have granted their respective motions to suppress. In appellant Ensley's second issue, she complains that a statement she made to Deputy Darlene Davis while awaiting her interview with Officer Jordan should have been suppressed. Appellant McCulley contends, in his first issue, that the evidence found in a Crown Royal whiskey bag during the police shootout should have been suppressed.

■ The trial judge's findings of fact at a suppression hearing are conclusive on appeal unless the evidence preponderates otherwise. *State v. Woods*, 806 S.W.2d 205 (Tenn.Crim.App.1990). However, the record indicates that the trial judge simply denied the motion without making his findings of fact. Thus, our review will extend to the transcripts of the respective suppression hearings.

### Appellant Ensley

Following the police shootout at the Jeffery residence, Ensley was taken to the station for questioning. While waiting for Agent Jordan to arrive, Deputy Darlene Davis was assigned to sit with Ensley. Davis testified that Ensley was not in custody.

Davis testified at the suppression hearing that she did not give Ensley *Miranda* warnings because her duty was simply to watch Ensley until other officers arrived. Davis added that she did not question Ensley and when Ensley began to speak, told her that she did not have to tell her anything. Davis said that Ensley "just started talking." Appellant Ensley told Davis that she would always love Randall Ensley and that "we went ... by the apartment ... and his van ... was there." These statements were introduced at trial.

■ Appellant Ensley argues that her statements were not freely and voluntarily made; however, she offers no convincing support for her position. Nonetheless, as argued by the state, statements which are spontaneous and volunteered are admissible in the absence of *Miranda* warnings. *State v. Irick,* 762 S.W.2d 121 (Tenn.1988). Following our review of the suppression hearing transcript, we do not find that the evidence preponderates against the trial judge's decision. This issue has no merit.

### Appellant McCulley

Appellant McCulley was apprehended behind the Jeffery residence following the shootout. The appellant had on or near his person, a Crown Royal whiskey bag. The testimony at the suppression hearing does not give a clear indication of the precise location of the Crown Royal bag. The officer was unsure whether the bag fell from McCulley's pocket or was thrown when he was shot. Thus, our review will encompass the legality of the search of the bag under both scenarios.

■ First, if the bag was thrown by McCulley, we find support for the proposition that it was abandoned. The inference may be reasonably drawn that McCulley wanted to distance himself from the incriminating evidence inside the bag. To that end, he abandoned the Crown Royal bag. Under this interpretation of the facts at the suppression hearing, the appellant has surrendered his legitimate expectation of privacy in the bag and has no standing to challenge its search. *See State v. Brenda Hill,* No. 274, 1990 WL 111448 (Tenn.Crim.App. Aug. 7, 1990, Knoxville).

■ Secondly, the state argues that if the bag simply fell from appellant's person when he was shot, the search of the bag was incident to a lawful arrest. We recognize that a warrantless search is presumptively unreasonable unless it is conducted within a recognized exception such as a search incident to a lawful arrest. *State v. Woodard,* No. 01C01–9503–CR–00066, 1996 WL 76022 (Tenn.Crim.App. Feb.23, 1996). The state carries the burden of showing that a warrantless search was conducted within an exception. *State v. McClanahan,* 806 S.W.2d 219, 220 (Tenn.Crim.App.1991).

The state's position is that the officers lawfully searched the bag which had been in appellant's control just seconds before he was subdued. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court held that if probable cause exists to arrest the appellant, the objects and areas under his control may be searched incident to that arrest. Although the appellant argues that he was already restrained when the bag was searched, we find this fact of little value. Under this version of the facts, the search incident to arrest was proper.

■ Finally, even if the search did not fit into this exception, the contents of the bag would have been inevitably discovered. Under the inevitable discovery doctrine, illegally obtained evidence is admitted by the court when the evidence would have inevitably been discovered by lawful means. *See State v. Patton,* 898 S.W.2d 732, 735 (Tenn.Crim. App.1994) citing *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). One of the officers testified that following the appellant's arrest, he secured the Crown Royal bag in the trunk of the patrol car. Before leaving the scene he and another officer inventoried its contents by initialing each item contained in the bag. The purposes of such an inventory search is to (1) protect the owner's property, and (2) protect the officers from negligence and civil rights claims in the event the item disappears or is damaged. *State v. Cabage,* 649 S.W.2d 589, 592 (Tenn.1983).

Based on our review of the transcript of the suppression hearing, we find that the trial court properly denied the motion to suppress. This issue is without merit.

### III & IV. SUFFICIENCY OF THE EVIDENCE

Because appellant Ensley's third and fourth issues challenge the sufficiency of the evidence, we combine them for review. Ensley first claims that the trial court should have dismissed the case because the state failed to prove the allegations contained in the bill of particulars. Secondly, Ensley makes a general challenge to the sufficiency of the evidence.

 In a sufficiency of the evidence challenge, the relevant question on appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); T.R.A.P. 13(e).

 In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state. *State v. Williams,* 657 S.W.2d 405 (Tenn. 1983). Moreover, a guilty verdict replaces the presumption of innocence enjoyed at trial with the presumption of guilt on appeal. *State v. Grace,* 493 S.W.2d 474 (Tenn.1973). The appellant has the burden of overcoming the presumption of guilt. *Id.* On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832 (Tenn. 1978).

 First degree murder is defined as "[a]n intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39–13–202(a)(1) (1991). The elements of premeditation and deliberation are not synonymous. *State v. Brown,* 836 S.W.2d 530, 538 (Tenn.1992). Premeditation requires a previous intent to kill while deliberation re-

quires "some period of reflection, during which the mind is free from the influence of excitement." *Id.* at 539. Although the evidence against Ensley is circumstantial, the *Brown* court held that both elements may be proven by circumstantial evidence. *Id.* at 541.

 When the evidence against an appellant is entirely circumstantial, the evidence must "exclude all reasonable hypothesis other than that of guilt." *Davis v. State,* 577 S.W.2d 467, 469 (Tenn.Crim.App.1978). "A web of guilt must be woven around the defendant from which [s]he cannot escape and from which the facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610, 613 (1971).

In *State v. Singleton,* No. 03C01–9406–CR–00221, 1994 WL 772861 (Tenn.Crim.App. Mar.13, 1995), this Court, citing *State v. Gentry,* 881 S.W.2d 1 (Tenn.Crim.App.1993), found the following three considerations useful in analyzing the evidence of premeditation and deliberation:

(1) facts about how and what the defendant did prior to the actual killing which show [s]he was engaged in activity directed toward the killing, that is, planning activity;

(2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and

(3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must [have] intentionally killed according to a preconceived design.

*Singleton* citing *State v. Gentry,* 881 S.W.2d at 4–5.

 As to the first consideration, there was evidence of planning activity. One witness testified that prior to the murders, Ensley said that she would be wearing Diane McKheen's rings. Another witness testified that during a Christmas eve telephone conversation with McKheen, McKheen told her that Ensley had been calling and threatening

her. McCulley told one witness that he planned to kill Randall Ensley for his insurance policy but had to wait until December for the policy to go into effect. Further, Ensley rented a nearby motel room for Christmas day and night for two people. Both appellants stayed at the motel. Other evidence tied the appellants closely to each other. In fact, McCulley depended on Ensley for transportation as he did not have a vehicle. Ensley told Deputy Davis that they went by the apartment and the van was there. This evidence indicates planning activity.

Secondly, the state presented a number of motives for the killings. Several witnesses testified that the appellants believed that appellant Ensley's children were the named beneficiaries in Randall Ensley's insurance policy. As stated above, McCulley had said that he was going to kill Randall Ensley when the policy went into effect. The state also painted the picture of an older manipulative woman, Ensley, persuading a younger lover, McCulley, to kill her ex-husband and his fiancé. Evidence indicated that Randall Ensley had been giving appellant Ensley money even after the divorce. However, when Diane McKheen walked into the picture, Randall Ensley made known his intentions to discontinue these monetary payments to Ensley.

Appellant Ensley admitted her continued affection for Randall Ensley. The state wanted to convince the jury that appellant Ensley used this fact to fuel McCulley's jealousy. With McCulley enraged, appellant Ensley was able to convince McCulley to assist her in killing her ex-husband and his new fiancé. Although appellant Ensley denied animosity toward McKheen, evidence indicated that she resented being replaced. The victims' recent engagement was likely "the straw that broke the camel's back." Appellant Ensley had the additional motive of making McKheen pay for taking Randall Ensley away from her. As stated above, Ensley told a witness that she would be wearing McKheen's rings. After the murder, she indeed had McKheen's rings.

Finally, the facts surrounding the killings illustrate deliberation. These were not a "heat of passion" murders. Both victims were in the living room of their apartment on Christmas night. McKheen was shot once in the chest and three times in the head. Ensley received two bullets to the head. All the shots were fired at close range and indicate a design to kill. The casings remained on the floor. McCulley told Jeffery that he went back to the residence after the killings to make it look like a robbery. Other evidence indicates that the rings were taken off the victim's fingers. These were described by the state as trophies of the appellants' accomplishment. These facts support the existence of deliberation.

Further testimony revealed that McCulley did not have a car and went everywhere with Ensley. On Christmas night, the appellants were together at the Diplomat Motel. The time lines of their activities on Christmas night are inconsistent. However, one witness visited by the appellants late Christmas night indicated that both appeared nervous and withdrawn even though both were described as "talkers."

The evidence so entangles both appellants that it was reasonable for the jury to conclude that the appellants executed their plan to kill Randall Ensley and Diane McKheen. We find that sufficient evidence existed to support their finding. The web of guilt has been woven around appellant Ensley from which she cannot escape. This issue is without merit.

## V. CONSECUTIVE SENTENCES

Finally, both appellants argue that the trial court erred in ordering consecutive sentences. Our review of the sentences is *de novo* with a presumption that the determinations of the trial court are correct. Tenn.Code Ann. § 40–35–401(d) (1990); *State v. Byrd*, 861 S.W.2d 377, 379 (Tenn. Crim.App.1993). This presumption is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991).

The court may order sentences to run consecutively if it finds, by a preponderance of the evidence, any one of the following:

(2) The defendant is an offender whose record of criminal activity is extensive;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; ...

(6) The defendant is sentenced for an offense committed while on probation.

Tenn.Code Ann. § 40–35–115(b)(2), (4) & (6) (1991).

### Appellant Ensley

 The trial court found that Appellant Ensley is a dangerous offender and imposed consecutive sentences pursuant to subsection (b)(4) above. In *State v. Wilkerson,* 905 S.W.2d 933 (Tenn.1995), our Supreme Court held that the trial court must first find that the defendant is a dangerous offender. Once such a determination is made, the proof must also show that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. *Id.* at 939. Here, the trial judge used, almost verbatim, the language set forth in *Wilkerson* and made the requisite findings. Based on the proof presented, we agree that Appellant Ensley is a dangerous offender and that consecutive sentences are supported by the record. This issue is without merit.

### Appellant McCulley

Appellant McCulley contends that the trial judge erred in ordering his two thirty-year sentences to run consecutively. The trial judge found support for consecutive sentences under all three subsections cited above. Although only one basis is needed to impose consecutive sentences, we agree that the record supports all three bases.

The large number of convictions contained in the presentence report illuminate appellant McCulley's extensive criminal history. Additionally, the record indicates that the attempted second degree murders were committed while McCulley was on probation.

Either of these bases supports consecutive sentencing. Thus, it is unnecessary to address the appellant's classification as a "dangerous offender." Appellant McCulley's second issue is without merit.

### CONCLUSION

The convictions and sentences of both appellants are affirmed.

TIPTON, J., and CHARLES LEE, Special Judge, concur.