IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2016 Session

**STATE OF TENNESSEE v. CHRISTOPHER DOUGLAS SMITH**

**Appeal from the Circuit Court for Carroll County**
**No. 15-CR-78        Donald E. Parish, Judge**
_____

**No. W2015-01826-CCA-R10-CD  -  Filed March 14, 2017**
_____

After the trial court denied an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, the State sought an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure.  This Court granted the State's application.  On appeal, the State argues that the trial court erred in excluding the evidence seized from Defendant because the arresting officer had probable cause to arrest him for a felony drug offense and search him incident to that arrest.  Following our review, we reverse the judgment of the trial court.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Circuit Court Reversed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. CAMILLE R. MCMULLEN, J., filed a dissenting opinion.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Matthew F. Stowe, District Attorney General; and R. Adam Jowers, Assistant District Attorney General, for the appellant, State of Tennessee.

Benjamin S. Dempsey, Huntingdon, Tennessee, for the appellee, Christopher Douglas Smith.

**OPINION**

*Factual Background*

On May 4, 2015, the Carroll County Grand Jury returned an eight-count indictment charging the Defendant, Christopher Douglas Smith, with possession of

methamphetamine with intent to deliver in Counts 1 and 5, possession of drug paraphernalia in Counts 2 and 8, unlawful possession of a weapon by a convicted felon in Count 3, possession of a weapon during the commission of a dangerous felony in Count 4, possession of hydrocodone with intent to deliver in Count 6, and possession of less than 0.5 grams of marijuana in Count 7. Counts 1 through 4 were alleged to have occurred on December 14, 2014, and Counts 5 through 8 were alleged to have occurred on March 12, 2015. On June 19, 2015, Defendant filed a motion to suppress evidence seized during his March 12, 2015 arrest, specifically, approximately 30.2 grams of methamphetamine, seven-hundred dollars in cash, a small bag of marijuana, an LG smart phone, and eighteen hydrocodone pills. The Carroll County Circuit Court held an evidentiary hearing on July 2, 2015.

Investigator Joey Hedge testified that, on March 12, 2015, he obtained a search warrant for Defendant's house. The search warrant was based on information received from a confidential informant ("CI") who informed Investigator Hedge that methamphetamine was being sold out of Defendant's house by Defendant and his girlfriend, Tonya Swafford. Investigator Hedge testified that the CI had provided reliable information in the past that led to other search warrants and convictions. Investigator Hedge also stated that he "was getting information all over the place" that Defendant was selling drugs. Investigator Hedge had been to Defendant's house three months prior in December 2014 to execute another search warrant where he recovered methamphetamine and drug paraphernalia. Investigator Hedge included information about the prior search warrant and items found at Defendant's house in December 2014 in the affidavit supporting his March 2015 search warrant.

The search warrant for Defendant's house was obtained at 2:15 p.m. on March 12, 2015. Before executing the search warrant, Investigator Hedge called the CI and asked him to go back to Defendant's house to "see if there [were] any drugs in the residence." The CI confirmed that there were and that Defendant "had, in his pocket, approximately a golf ball size of [m]ethamphetamine." Investigator Hedge drove to Defendant's house to execute the warrant, however, Defendant and Ms. Swafford were not home. Investigator Hedge testified that he then "circled through town" and "[saw] both parties traveling [e]ast on Main Street in [their] vehicle." Investigator Hedge said that he was "very familiar" with Defendant, Ms. Swafford, and the car they drove because he had stopped them in the car before and had "seen it around." After seeing Defendant and Ms. Swafford drive by, Investigator Hedge called another officer he was working with, Officer Drake Whitworth, "to let him know that [Investigator Hedge] was looking for the vehicle." Investigator Hedge proceeded to the Huntingdon Police Department where he met Commander Johnny Hill and got in an unmarked patrol car. Officer Whitworth then called Investigator Hedge and informed him that Defendant and Ms. Swafford were in the parking lot of Prater's Taters, a local business on Main Street.

Investigator Hedge and Commander Hill drove to the parking lot where they saw Defendant "leaning over in a vehicle." The officers pulled into the parking lot and parked in front of Defendant and Ms. Swafford's car but did not turn on the blue lights of the patrol car. Investigator Hedge testified that, once he pulled in, he saw Defendant talking to two other individuals in a car parked beside Defendant's car. Investigator Hedge said that he was familiar with one of the individuals because she was "known for drugs" and he received information in the past regarding her involvement with methamphetamine. Investigator Hedge then confronted Defendant to inform him that the officers had a search warrant for his house. Investigator Hedge recalled that, when he first confronted Defendant, he "was getting a little antsy" and "acted as if he was going to run." Investigator Hedge testified that he "went ahead and put cuffs on [Defendant], and told him he wasn't under arrest, but he was being detained." Next, Investigator Hedge performed "a slight pat down" of Defendant to check for weapons, but did not feel anything that appeared to be a weapon. At some point, Investigator Hedge learned that Ms. Swafford was in a nearby store, and he entered the store to also inform her that officers had a search warrant for her house. Investigator Hedge confronted Ms. Swafford inside the store and testified that she told him, "I've got what you want" or "what you're looking for" and that it was in her purse. Investigator Hedge escorted Ms. Swafford outside where he searched her purse and found approximately 2.8 grams of methamphetamine.

When Investigator Hedge returned to the parking lot, he performed a second pat down of Defendant "[s]ince [the officers] had received information of [Defendant] having [m]ethamphetamine in his pocket." Investigator Hedge testified that he felt money in Defendant's pocket as well as "a bulge that had a gritty feeling," which, in his experience as an officer, felt like methamphetamine. Investigator Hedge seized the items from Defendant, which included 30.2 grams of methamphetamine, cash, a cell phone, and a small amount of marijuana. Investigator Hedge clarified that, before he performed the second pat down of Defendant and seized the items from Defendant, he read both Defendant and Ms. Swafford their *Miranda* rights.[1] Investigator Hedge also testified that Ms. Swafford signed a written consent to search both her house and the car, which was titled in her name. In the car, officers found a ledger with names and numbers and an unmarked bottle in the console containing eighteen hydrocodone pills. After searching Defendant's house, officers found a plate with white residue on it which tested positive for methamphetamine, another ledger with names and numbers, scales, and methamphetamine slides. Investigator Hedge testified that Defendant had approximately $700 cash in his pocket and that Ms. Swafford had $1115 cash in her purse.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

After the State's direct examination of Investigator Hedge, the trial court asked a series of questions relating to the location of the officers' patrol car and the car that Defendant and Ms. Swafford had driven to the parking lot. After repeated questioning, Investigator Hedge acknowledged that it was his intent to block Defendant and Ms. Swafford's car when he pulled in front of them in the parking lot.

On cross-examination, Investigator Hedge acknowledged that he had been watching Defendant's house for about twelve weeks prior to March 12, 2015. He also stated that he had known Defendant "since the late 90s" and had stopped him approximately four or five times in the past but acknowledged that none of Defendant's prior arrests had been for methamphetamine.

The trial court granted the motion to suppress all items except the hydrocodone pills, which were found in the car and not on Defendant's person. Specifically, the court found that, while Investigator Hedge had a right to encounter Defendant in the parking lot and ask him questions, "it was the officer's intention to detain [Defendant] from the very beginning." Furthermore, the court found that Investigator Hedge intended to detain Defendant by blocking his car from moving and that, "as soon as they encountered each other, the officer handcuffed [Defendant], and told him that he was being detained. That is an arrest. That's the definition of an arrest, and he did so without just cause to do it at that particular time." The trial court entered an order on July 16, 2015, suppressing the evidence and dismissing two counts of the indictment.

Ultimately, this Court granted the State's application for extraordinary appeal pursuant to Rule 10, and concluded that "the trial court 'acted in an arbitrary fashion' by refusing to grant the State an interlocutory appeal pursuant to Rule 9" and that "review of the suppression issue at this time is necessary to prevent possible irreparable injury to the public's interest." *See State v. Meeks*, 262 S.W.3d 710, 720 (Tenn. 2008).

*Analysis*

The State claims that the trial court improperly suppressed the evidence found on Defendant because Investigator Hedge had probable cause to believe that Defendant unlawfully possessed a quantity of methamphetamine when he was arrested. Defendant does not respond to the State's argument regarding probable cause. Rather, Defendant argues that the trial court properly suppressed the evidence because Defendant was subject to an improper stop and frisk pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

When reviewing a motion to suppress, this Court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence and

resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005).

The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996)). In the case of a warrantless search, the State bears the burden of proving that the search was conducted pursuant to one of the exceptions to the warrant requirement. *Id.*

Not all police-citizen encounters implicate constitutional protections. *See, e.g.*, *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006). The Tennessee Supreme Court has recognized three tiers of interactions between law enforcement and private citizens: "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). Of these categories, "only the first two rise to the level of a 'seizure' for constitutional analysis purposes." *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). "[W]hat begins as a consensual police-citizen encounter may mature into a seizure of the person." *Daniel*, 12 S.W.3d at 427. A seizure occurs "'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Day*, 263 S.W.3d at 901-02 (quoting *Terry*, 392 U.S. at 19, n.16). The relevant inquiry is "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" *State v. Randolph*, 74 S.W.3d 330, 336 (Tenn. 2002) (quoting *Daniel*, 12 S.W.3d at 425).

As an initial matter, the record reflects that Investigator Hedge's search of Defendant could only qualify as a search incident to arrest, not an investigatory stop and frisk, because Defendant was immediately restrained and handcuffed prior to any pat down or search of his person. The trial court found that Investigator Hedge apprehended Defendant and intended to place him under arrest when he blocked Defendant's car in the parking lot. Investigator Hedge also acknowledged that it was his intent to block Defendant at that point. However, even if the arrest did not occur at this point, Defendant was clearly arrested when he was handcuffed and restrained by Investigator Hedge.

Although Investigator Hedge claimed only to "detain" Defendant and not "arrest" him when he handcuffed him, as the State correctly concedes, the subjective intent of the officer and whether he intends to arrest or detain a defendant is irrelevant. *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014) (citing *State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996)). Rather, the correct determination is whether "a reasonable, innocent person would not feel free to leave" and whether there is "actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." *Bishop*, 431 S.W.3d at 35. Defendant was clearly restrained from movement and not free to leave when Investigator Hedge confronted him in the parking lot. *See Daniel*, 12 S.W.3d at 426 ("[C]ourts have typically held that an encounter becomes a 'seizure' if an officer. . . physically restrains a citizen or blocks the citizen's path"). Furthermore, the initial pat down of Defendant did not result in the seizure of any evidence. Rather, the evidence was seized when Investigator Hedge performed a second subsequent pat down after Defendant had already been handcuffed and verbally given his *Miranda* rights. Therefore, the search of Defendant could only be valid as a search incident to an arrest, and the validity of the search depends on the validity of the arrest, which requires probable cause.

A police officer may make a warrantless arrest when the officer has reasonable cause to believe that the person being arrested committed a felony. *See* T.C.A. § 40-7-103(a). "A full-scale arrest supported by probable cause is, of course, an exception to the warrant requirement." *State v. Echols*, 382 S.W.3d 266, 278 (Tenn. 2012) (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009)). Probable cause requires more than "mere suspicion," but does not require "absolute certainty." *Yeargan*, 958 S.W.2d at 637 (citing *Grey v. State*, 542 S.W.2d 102, 104 (Tenn. Crim. App. 1976)); *State v. Tays*, 836 S.W.2d 596, 598-99 (Tenn. Crim. App. 1992). "Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" *State v. Bridges*, 963 S.W.2d 487 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

The warrantless arrest herein was based in part on information from the CI, necessitating the application of the two-prong *Aguilar-Spinelli* test. *See Aguilar v. Texas*, 378 U.S. 108 (1964); *Spinelli v. United States*, 393 U.S. 410 (1969); *see also State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989) (adopting the *Aguilar-Spinelli* test over the totality of the circumstances approach announced in *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). If probable cause for a warrantless arrest is based upon information obtained from a CI, the *Aguilar-Spinelli* test requires: (1) the CI have a basis for the knowledge provided, and (2) the CI is credible or the information reliable. *See Tays*, 836 S.W.2d at 600 (applying *Aguilar-Spinelli* test to the validity of an arrest based on information

supplied by a confidential informant).  Here, the CI had a basis of knowledge, established by the CI's prior observations which led to the grant of a search warrant for Defendant's home as well as the CI's personal observation of Defendant's criminal activity in the form of Defendant's possession of a "golf ball" size piece of methamphetamine in his pocket hours prior to the arrest.  Moreover, the fact that a search warrant had already been issued by a neutral and detached magistrate on the basis of the CI's observations support a finding that the CI was credible.  Additionally, Investigator Hedge testified as to the CI's credibility at the hearing by informing the trial court that the CI gave information in the past leading to arrests and had worked with several law enforcement agencies as a CI.  Finally, even if for some reason the information provided by the CI does not in and of itself satisfy the *Aguilar-Spinelli* test, the independent observations of the investigator, coupled with the information supplied by the CI, gave probable cause for the arrest.  The investigator saw Defendant outside his parked car in a parking lot.  At the time, Defendant, who had previous arrests for drug related offenses, was leaning into the window of the car of a known drug user just a few hours after the CI reported to the investigator that Defendant had a pocket full of methamphetamine.  All of this knowledge together certainly gave the officer probable cause for a warrantless arrest.  Because probable cause existed for the arrest, the trial court's grant of the motion to suppress must be reversed.

Further, while not argued by the State, even if there was no probable cause for Defendant's arrest, the items located in Defendant's pocket would have been inevitably discovered after Defendant's companion gave written consent to search the vehicle in which Defendant was riding.  Under the inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means.  *Nix v. Williams*, 467 U.S. 431, 444 (1984); *State v. Ensley*, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996).  Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment."  *Nix*, 467 U.S. at 444 n.5.  Interestingly, the trial court in this case determined that the search of the car was lawful and did not dismiss the count of the indictment charging Defendant with possession of the hydrocodone pills found therein.  The trial court found that the hydrocodone was a "different category" because it was "evidence that was seized from the vehicle with permission by the owner and the driver was granted the search of the vehicle;" the only question was whether Defendant was in possession of those items.  When Investigator Hedge approached Defendant's companion in the nearby store, she told him she had what he wanted.  They returned to the vehicle and a search of her purse resulted in the discovery of methamphetamine.  She was arrested and later consented to a search of the vehicle.  The search of the vehicle resulted in the discovery of eighteen hydrocodone pills.  At that time, Defendant could have been arrested for possession of the hydrocodone.  The officers could have then searched his

person incident to a lawful arrest, and the methamphetamine, cash, cell phone, and marijuana would have been inevitably discovered.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is reversed and the case remanded for further proceedings.

_____

TIMOTHY L. EASTER, JUDGE