# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### MAY SESSION, 1998

FILED

December 30, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9702-CR-00066** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **DAVIDSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. ANN LACY JOHNS** |
| **JAMES MURRAY,** | ) | **JUDGE** |
| **MARCIE MURRAY and** | ) | |
| **SHARON R. HURT** | ) | |
| Appellant. | ) | **(Direct Appeal - First Degree Murder** |
| | ) | **and Conspiracy to Commit First** |
| | ) | **Degree Murder)** |

FOR THE APPELLANT:

JOHN E. RODGERS, JR.
Suite 1230, First American Center
315 Deaderick Street
Nashville, TN 37238-1230
(Attorney for James Murray)

CHARLES R. RAY
211 Third Avenue North
P. O. Box 198288
Nashville, TN 37219-8288
(Attorney for Marcie Murray)

PETER J. STRIANSE
21st Floor, First American Center
Nashville, TN 37238
(Attorney for Sharon Hurt)

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

DARIAN B. TAYLOR
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

VICTOR S. JOHNSON
District Attorney General

TOM THURMAN
ROGER MOORE
Assistant District Attorneys
Washington Sq., Ste. 500
Nashville, TN 37201-1649

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

On August 2, 1995, a Davidson County jury convicted Appellants Sharon Hurt, Marcie Murray, and James Murray of one count of first degree murder and one count of conspiracy to commit first degree murder. After a sentencing hearing on December 14, 1995, Sharon Hurt was given consecutive sentences of life imprisonment and twenty-four years, Marcie Murray was given consecutive sentences of life imprisonment and twenty years, and James Murray was given consecutive sentences of life imprisonment and twenty-two years. Appellants challenge both their convictions and their sentences, raising the following issues:

1) whether the trial court properly denied Appellants' motions to sever the trial of each Appellant;
2) whether the evidence was sufficient to support Appellant James Murray's convictions;
3) whether the trial court properly admitted Appellant James Murray's statements made to law enforcement officials;
4) whether the trial court properly denied Appellant Marcie Murray's motion for a mistrial after testimony about an investigation regarding her conduct at work;
5) whether the trial court properly admitted testimony about the seizure of Appellant James Murray's automobile;
6) whether the trial court properly admitted a shotgun shell into evidence as a demonstrative aid;
7) whether the State improperly withheld exculpatory evidence and used perjured testimony from a co-defendant;
8) whether Appellants were entitled to a new trial based upon newly discovered evidence;
9) whether the trial court properly denied state funds for Appellants to hire an expert in the field of pathology/toxicology;
10) whether Appellant Sharon Hurt was entitled to a mistrial when a co-defendant testified that "they did stuff like this before";
11) whether the trial court properly refused to allow Appellants to impeach their co-defendant's testimony with testimony from another witness;
12) whether the trial court erred when it failed to order the State to provide the criminal records of all of its witnesses to Appellants;
13) whether the trial court properly gave a missing witness instruction regarding an alibi witness;
14) whether the jury engaged in misconduct;
15) whether Appellant James Murray was prejudiced by the court reporter's failure to record certain statements made during various bench conferences;

16) whether the trial court properly imposed consecutive sentences on each Appellant; and

17) whether there was cumulative error that requires reversal.

After a review of the record, we affirm the judgment of the trial court.

## I. FACTS

According to the evidence presented at trial, Don Hurt married his second wife, Appellant Sharon Hurt, in February, 1988. Early in the marriage, the couple moved several times until Don Hurt built a house in Goodlettsville, Tennessee that was financed by his mother's $25,000 mortgage on her home, which was never repaid. In March, 1990, the couple took out two insurance policies with Farmer's New World Life Insurance, one for Don Hurt and one for Sharon Hurt. Don's policy was for $150,000 and Sharon's policy was for $100,000. Beginning in June, 1990, the couple separated for a six month period, during which time Don Hurt filed for bankruptcy.

Leonard Rowe testified that he met Sharon Hurt in the summer of 1990, and the two soon began having an affair. Rowe provided Sharon Hurt with money, a condominium, and a job as his "personal secretary". Sharon Hurt's salary was paid in cash and was not recorded in the company books. Rowe also gave Sharon money to buy a pink Cadillac. When Rowe decided to return to his wife in December 1990, Sharon became angry and moved back in with Don Hurt. The affair continued, however, and Sharon continued to work for Rowe's Company.

Wanda Hudgins testified that in January 1991, she had a conversation with Sharon Hurt about Don Hurt. Sharon stated that she was "sick" of her husband

and "couldn't stand him" because he was "smothering her." On another occasion, Hudgins went with Sharon to meet with Rowe at his place of business. Sharon began to tell Rowe "how much trouble" Don was causing her. Rowe then took some letters out of a safe and Sharon told Hudgins that she was keeping these letters for "ammunition" for when she could divorce Don because she was "not leaving with nothing. I'm going to take him for everything." Rowe then reached into his desk, pulled out a gun, and said "I have something that will take care of Don Hurt." Rowe later attributed this behavior to "acting macho" and "running off at the mouth."

Rowe testified that as a result of his affair with Sharon Hurt, he met some of her family, including her sister and brother-in-law, Appellants Marcie and James Murray. In February 1991, the Murrays told Rowe that Don Hurt had borrowed $15,000 from them, had not paid any of it back, and as a result, they were going to "kill the son-of-a-bitch." Rowe also testified that around this time, Sharon Hurt told him that she had offered James and Marcie Murray money to shoot her husband.

Hudgins testified that Sharon Hurt called her in May 1991 and requested some information. Sharon knew that Hudgins' first husband had been killed in an accident and she asked Hudgins how to determine the amount of life insurance she should have on Don. She also asked questions about how long it took to receive insurance proceeds after a person died and how to make a claim.

On May 31, 1991, Don and Sharon Hurt applied for an increase on the value of their life insurance by $100,000 each, to bring the total to $250,000 for Don[1] and $200,000 for Sharon. Alvie Besch, the Hurt's insurance agent, testified that although the increase was requested at the end of May, it did not go into effect immediately, but was held in abeyance until the underwriting cleared. Besch never actually informed Don and Sharon Hurt when the increase went into effect.

On Friday, June 8, 1991, Don Hurt made a request to a dispatcher for his employer, Malone & Hyde Trucking, to be assigned for a run the following Monday. The dispatcher, Richard Handley, testified that he complied and scheduled Don Hurt to make an early morning pick-up at a Nashville Dairy plant and truck the goods to a Memphis suburb. Handley testified that before making this run, Don would have had to go to the Malone & Hyde facility to get his cab. The Malone & Hyde truck terminal was located off Interstate 65 at the Long Hollow Pike exit in Goodlettsville, Tennessee. A Shoney's restaurant was also located at that exit. On Monday, June 10, 1991, at 11:28 p.m., a call was placed from a phone at this Shoney's to the Murray residence in Pigeon Forge, Tennessee, and was billed to the Murray residence by use of a calling card. At 11:30 p.m., a call was placed from a different telephone at Shoney's to Baptist Hospital in Knoxville where Marcie Murray worked. This call was also billed to the Murray residence by use of a calling card. James Murray later admitted to the police that he made these telephone calls.

---

[1]In addition, Don also had a life insurance policy for $30,000 through his employment.

During the early morning hours of June 11, 1991, Don Hurt was driving his truck near the Tennessee River when what he later described as a red or orange 1979–81 Firebird or Camaro type vehicle pulled alongside of his cab and someone in the car fired a shotgun at him. The slug penetrated the side of the truck just behind the driver's door, passed through the driver's seat, went through Don Hurt, ricocheted against the windshield, and landed on the floorboards near the passenger side of the vehicle. Don Hurt, who suffered gunshot wounds to his left shoulder and neck, was transported to the Camden Emergency Room and from there was taken to Columbia HCA Regional Hospital in Jackson.

Police investigators arrived at the scene at approximately 4:30 a.m. and took photographs. They located the shotgun slug and wadding inside the cab and sent the slug to the Tennessee Bureau of Investigation for analysis. A firearms specialist examined the slug and determined that it was a unique type of "sabot" shell which is typically fired from a 12-gauge shotgun. No arrests resulted from the police investigation.

Rowe testified that shortly after the shooting, he had a conversation with Sharon Hurt during which she said that "Marcie and Jimmy had messed the job up and she would have to take care of it herself." Shortly afterwards, Rowe saw all three Appellants in his office. At this time, Marcie and James Murray told him that they shot Don Hurt with a 12-gauge shotgun while he was driving on the interstate. Marcie Murray also told Rowe that they were going to go to the hospital to inject air into the tubes that fed Don intravenously. James Murray told Rowe that if he told anyone about the incident, "we don't mind taking your life and your whole damn family."

Don Hurt's Mother, Eva Oden, testified that at one point when she was sitting in Don's hospital room, Sharon Hurt and James and Marcie Murray entered the room and walked up close to Don with Sharon and Marcie at Don's left arm and James at his right. When Sharon saw that Oden was in the room, she stated "If I was the nurse in here, there wouldn't nobody be here." When Oden refused to leave the room, Sharon and the Murrays left the room without saying anything. Sharon Hurt told Rowe later that she and the Murrays had been unable to do what they had planned to do at the hospital because she had gotten into a fight with the Hurt family and because there were television monitors in the hallway.

Rick Hurt testified that while he was visiting his father in the hospital the day after the shooting, Sharon Hurt stated that whoever shot Don "didn't finish the job, but they would be back to finish it." When Rick replied that "snipers don't come back," Sharon responded "well, they'll be back."

Don Hurt spent a total of seven days in the hospital and he was discharged on June 18, 1991. After Don was shot on June 11, 1991, insurance agent Besch dealt solely with Sharon Hurt regarding the couple's insurance policies.

Rowe testified that some time in September or October 1991, Sharon Hurt and the Murrays came over to his residence in Nashville. At one point, the Murrays began laughing about how fast their Trans Am was and they stated that Marcie had driven the car while James shot Don Hurt through the window. Rowe's son Joey testified that he overheard James Murray talking to Marcie Murray and Sharon Hurt and that James stated that he didn't understand "how

it didn't kill him from a shot that short of a distance." Joey Rowe also stated that the Murray's had driven to his father's residence in two vehicles, a Bronco and a red Firebird or Trans Am.

Don Hurt's daughter Lisa testified that around Thanksgiving 1991, Don told her that he had canceled his life insurance policy because he and Sharon could not afford to pay their bills. Oden also testified that Don told her that he had canceled his life insurance policy.

Linda Gurley testified that she spoke to Sharon Hurt on the telephone in December 1991, and Sharon told her that she was "fed up" with Don. Sharon stated that she was "tired of him feeling sorry for himself" and "she was tired of having to take care of him, and she had had all she was going to take with him."

Jeanetta Russell testified that on December 19, 1991, Sharon Hurt told her that her husband was going to meet a man that night about a gun and that she was very concerned that he might be killed.

Rowe testified that on the morning or early afternoon of December 19, 1991, Sharon Hurt telephoned him and asked to meet with him at a restaurant. When Rowe arrived at the restaurant at 1:00 or 2:00 p.m., Sharon Hurt and James and Marcie Murray were outside in Sharon's car. Rowe walked up to the car and James Murray asked him about a .38 pistol that Rowe had recently purchased. Rowe retrieved the gun from his truck and James Murray asked if he could borrow the gun for a few days. Rowe agreed and gave the gun to James Murray. Rowe also testified that Sharon Hurt knew that he kept this gun in his

truck at all times. Rowe denied having any knowledge that the group was planning to kill Don Hurt at this time.

Mickey Dalton testified that on December 19, 1991, at approximately 8:00 p.m., she was driving down Williamson Road near the intersection of Old Springfield Highway in Goodlettsville. Because few cars ever parked on the side of the busy roads in that area, her attention was drawn to two cars that were parked on the side of the road. The car in the rear was an older gold colored car while the car in the front was a newer "light pastel funny colored kind of pastel car," that appeared to be a make and model similar to a Cadillac Seville. She noticed that two people were sitting in the front of the newer looking car.

The police discovered Don Hurt's body sitting on the passenger side of his gold colored vehicle on Williamson Road at approximately 11:00 a.m. on December 20, 1991. An autopsy revealed that Don Hurt had sustained two gunshot wounds to the left side of his head, one at near contact and one at contact. Each shot, although closely placed to each other, was fired from a different angle. Both of the shots were fatal and Don would have been immediately unconscious. The autopsy revealed that Don's time of death was between 7:30 and 8:00 p.m. on December 19, 1991. Firearms specialist Steve Scott testified that a bullet fragment retrieved from Don Hurt's head and a fragment found lying on the floor of Don's car were both .38 caliber bullets.

Doctor Charles Harlan testified that an examination of Don Hurt's blood revealed that he had consumed one to two mixed drinks within one hour of his death. In addition, his blood contained quantities of the antidepressant Elavil and

diphenhydramine, commonly known as Benadryl. Doctor Harlan testified that Benadryl can be used as a sedative as it has the side effect of making a person feel sleepy. Don's blood contained an amount of Benadryl that was approximately twenty times greater than the normally accepted therapeutic level. Benadryl is fast acting and will reach maximum effectiveness within one hour. Doctor Harlan testified that this high level of Benadryl mixed with alcohol would have made Don drowsy. Benadryl could be obtained in capsule form or in liquids either with flavor or without.

The only items of jewelry found on Don Hurt's body were his wedding ring and a wrist watch. According to Don's son Rick, Don always wore a horseshoe ring, a cluster ring, and a gold necklace in addition to his watch, but these items were never found.

Insurance agent Besch testified that sometime during the early morning hours of December 21, 1991, he received a telephone call from a friend of Sharon Hurt who notified him that Don Hurt had been murdered. Besch testified that he could hear Sharon crying on the other end of the phone. Besch also stated that this was the only time that he had ever been awakened in the middle of the night to be notified that one of his clients had died.

Rowe testified that when he learned of Don Hurt's death, he called James Murray to ask him if he had his .38 pistol. James told him that he had disassembled it and strewn it along the interstate on the way back to Sevierville, Tennessee. James also stated that he and Marcie had thrown their blood soaked clothes off a bridge into a river on their way home.

-10-

Judy Tankersley testified that she accompanied Eva Oden and Sharon Hurt to the funeral home in order to make plans for Don's wake and funeral service. Tankersley testified that when the mortician asked Sharon how she would pay for the funeral, she took out some papers and said "I can pay for it because one of these is for two-hundred-thousand dollars. When Oden said "that is not true. Don canceled that insurance policy," Sharon responded, "[N]o, he thought he did. I had some friends that helped me keep it paid." Oden confirmed that this conversation took place. Tankersley and Oden both testified that Sharon said that she was a "rich widow now."

Rowe testified that at some point after the funeral, Sharon Hurt told him that "She wouldn't have went along with them to murder [Don] if she had known they were going to beat him up like that." Sharon later told him that she was angry with the Murrays because they had taken Don's gold and diamonds and that she was going to deduct that from the amount of money that she owed them.

Linda Gurley testified that shortly after Don Hurt's murder, she had a conversation with Sharon Hurt during which Sharon discussed the investigation of Don's death and stated that she was "at the point she was willing to buy someone." When Gurley told Sharon that she had been out of town when Don was killed, Sharon said "Oh that's right. I forgot." A few months later, Sharon asked Gurley to testify that Don and Rowe had settled their differences and were friends. Gurley told her that she could not agree because it was not true.

Rowe testified that in July 1992, he asked James Murray to tell him precisely what happened the night that Don Hurt was murdered. James told him

that they had put "mickeys" in Don's drinks and then the three of them walked him through the front door and out to the car. James and Marcie then each shot Don in the head. They then took jewelry from the body and James later melted it down at a place where he worked. At this time Marcie stated that "we still want you to know if anything is ever said about this . . . we don't mind taking your life and your whole damn family."

On March 5, 1993, Captain Randy Parton of the Sevier County Sheriff's Department impounded a red 1982 Firebird that belonged to James Murray.

Rowe and Sharon Hurt were arrested in Nashville on September 13, 1993. Rowe initially lied to the police regarding his relationship with Sharon Hurt and his knowledge of the plan to murder Don Hurt. However, Rowe eventually decided to come forward and provide information to the authorities in exchange for having his bond lowered. In addition, he was granted use immunity for anything that he told the authorities. Rowe was also promised "consideration" at the time he entered his plea and he acknowledged that the only reason why he was testifying was to get as much "consideration" as possible. Both Rowe and his attorney testified that no other promises had been made in exchange for his testimony.

James and Marcie Murray were arrested in Franklin, Kentucky on August 28, 1994. Detective Ed Moran testified that after James Murray was placed in the police car for transport, he told Moran "I knew that it was over when I saw the two [Kentucky State Police] cars parked down the street, and I'm glad its over with." After Moran read the indictment to James and advised him of his constitutional

rights, James stated that he "knew some information in this case," and that he "wanted to make a deal." Moran told him that he was not authorized to make a deal and that James would have to speak with the district attorney general. When Moran later returned to transport James to Tennessee, James stated that he had some information and he wanted to make a deal. When Moran reminded him that he was not in a position to negotiate a deal, James lowered his head and stated, "Well, what kind of deal can I get when I'm going to plead guilty."

## II. DENIAL OF SEVERANCE

All three Appellants contend that their trials should have been severed so that they could have been tried separately. Each Appellant gives various reasons for their positions, but they all basically contend that evidence presented against the other Appellants "spilled-over" onto them and unfairly prejudiced their ability to present their individual defenses. Rules 14(c)(2)(i) and (ii) of the Tennessee Rules of Criminal Procedure provide that the trial court shall grant a severance of defendants if deemed appropriate to promote or achieve a fair determination of a defendant's guilt or innocence. "Whether to grant a severance is within the trial judge's sound discretion." State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996). "The exercise of that discretion will not be reversed absent an affirmative showing of prejudice." Id. "In other words, the record must demonstrate that the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." Parham v. State, 885 S.W.2d 375, 383 (Tenn. Crim. App. 1994) (citation omitted). "The trial court, however, must not only protect the rights of the accused, it must also protect the rights of the state prosecution, and 'when

several persons are charged jointly with a single crime . . . the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants.'" State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982) (citation omitted).

## A. Witness Testimony

Appellants' make numerous allegations of prejudicial errors that they believe warranted severance of their trials both before the trial began and during the trial itself. Many of these allegations relate to the admission of statements from witnesses about one Appellant that "spilled-over" to the complaining Appellant. For instance, James and Marcie Murray contend that Don Hurt's mother, Eva Oden, should not have been allowed to testify that she had an altercation with Sharon Hurt at the hospital shortly after Don was shot in June 1991:

> Q: And did you later have an altercation with Sharon Hurt over you being at the hospital?
> A: Yes, sir.
> Q: Okay. We don't need to get specific there, but was there an altercation about that?
> A: Well, she had been gone several days, and I was still there. She came in with like a little overnight grip.
> Q: Okay. We don't need to get specific and--
> A: And she was standing at the little table. She took this chair and picked this chair--
> Q: Ma'am, please, just listen to my question, okay. We don't need to get real specific. Would you acknowledge there was an altercation without--
> A: Yes, there were--
> Q: --getting into all the details?
> A: Yes, there were.
> Q: Okay. And as a result of that, did you leave at that time?
> A: Yes, I did.

The State contends that James and Marcie Murray were not prejudiced by this testimony because it would have been admitted even if they had been tried

-14-

separately. We agree. In State v. Little, 854 S.W.2d 643 (Tenn. Crim. App. 1992), this Court stated that "a severance need not be granted where the evidence which was introduced could have been admitted against [the defendant] in a separate trial." Id. at 648. Oden's testimony would have been admitted even if the Appellants had been tried separately in order to establish the conspiracy offense. Indeed, there was evidence that the three Appellants went to the hospital to kill Don Hurt by injecting bubbles into his intravenous tubes. Proof of the altercation helped to explain why they left before accomplishing their goal. Thus, the Murrays have not shown that they were prejudiced by this testimony.

James and Marcie Murray also contend that they were prejudiced by Oden's testimony, elicited on cross-examination by counsel for Sharon Hurt, that Oden also made a claim on Don Hurt's insurance policies because she "had a bad feeling that [Sharon] might have been the person that killed [her] son." This statement was, of course, directed at Sharon Hurt and it did nothing to discredit the Murray's alibi defense. Further, the trial court noted that it was responsive to counsel's question about whether Oden had made a claim on the policies. The court also stated that its instructions at the end of trial would address the need to keep evidence separate as to each Appellant.[2] Because we presume that the jury followed its instructions, we hold that the Murrays have not shown that they were prejudiced by this statement. See State v. Lunati, 665 S.W.2d 739, 746 (Tenn. Crim. App. 1983) ("The trial judge instructed the jury that they were to

---

[2]The instruction read as follows:
You should give separate consideration to each defendant. Each is entitled to have his or her case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant. You can acquit all or convict all, or you can acquit one or more and convict the other or others. If you cannot agree upon a verdict as to all the defendants, but do agree upon a verdict as to one or more of them, you must render a verdict as to the one or more upon which you agree.

consider the charges against each defendant individually. It is presumed that the jury followed his instructions.").

James and Marcie Murray also make a general contention that they should have been granted a severance when Tankersley testified that she heard Sharon Hurt say that she was a "rich widow now." Again, this bare contention is not sufficient to establish prejudice because we presume that the jury followed the trial court's instruction to consider only the evidence applicable to each Appellant. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994) ("In most circumstances, we presume that a jury follows limiting instructions.").

James and Marcie Murray contend that they should have been granted a severance when Earl Roberts, the Hurt family attorney, testified about his representation of the Hurt family in a civil suit against Sharon Hurt. The Murrays contend that Roberts' testimony, that Sharon stated in her deposition that she had never been romantically involved with Rowe, violated the hearsay rules. We disagree. This statement was obviously not offered for the truth of the matter asserted, it was offered to show that Sharon lied in an attempt to cover up her participation in her husband's murder. Even if this statement could be characterized as hearsay, it was properly admitted as a statement by a co-conspirator in furtherance of the conspiracy.[3] See Tenn. R. Evid. 803(1.2)(E).

---

[3]The conspiracy did not end at Don Hurt's death, as Appellants had not yet obtained the insurance proceeds. See State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. Crim. App. 1994) ("[A] conspiracy continues until the conspirators' ultimate goal of collecting the proceeds of the crime has been achieved or abandoned."). In order to obtain the proceeds, Ms. Hurt obviously had to conceal her involvement in her husband's murder.

Marcie Murray also contends that Roberts should not have been allowed to testify that "we filed a lawsuit back in January of 1992, to prevent Sharon Hurt from receiving insurance proceeds. There is a State statute that says, in so many words, that the person cannot profit from their own crime, and--." The trial court ruled that this statement was admissible because Roberts was merely giving a responsive answer by stating the legal basis upon which he filed the lawsuit. Ms. Murray provides no authority to support her claim that admitting this statement was error and we hold that, at most, any error in admitting this brief statement was harmless because we cannot say that the admission of this statement "more probably than not affected the judgment." See Tenn. R. App. P. 36(b).

Marcie Murray also contends that the testimony of two court clerks, Robert Bradshaw and Susan Murillo, about Sharon Hurt's prior civil trial testimony violated the hearsay rules. We disagree. First, Sharon Hurt's statements and admissions made in the civil trial were made in an attempt to cover up her participation in the conspiracy to kill Don Hurt in order to obtain insurance proceeds. Thus, the statements fall under the statements of a co-conspirator exception to the hearsay rule. See Tenn. R. Evid. 803(1.2)(E).

Marcie Murray contends that she should have been granted a severance because Gurley gave testimony about Sharon Hurt that had a prejudicial spill-over effect on her. However, Ms. Murray has failed to specify which parts of Gurley's testimony were prejudicial or to explain why they were prejudicial. Presumably, she objects to Gurley's testimony that Sharon Hurt told her that the investigation had put her "at the point [that] she was willing to buy someone."

However, this testimony would have been admissible even if Ms. Murray had been tried separately because it was a statement by a co-conspirator in furtherance of the conspiracy to obtain the insurance proceeds. See Tenn. R. Evid. 803(1.2)(E).

Sharon Hurt contends that she should have been granted a severance when the trial court admitted taped telephone conversations between Rowe, the Murrays, and Detective Moran. Ms. Hurt does not specify which of these statements she objects to or exactly how these statements prejudiced her. However, these statements by the Murrays were basically attempts to establish an alibi for the time that Don Hurt was shot and ultimately killed. As such, the statements were properly admitted as to the Murrays as admissions of a party. See Tenn. R. Evid. 803(1.2)(A). Because we presume that the jury followed the trial court's limiting instruction, we hold that Ms. Hurt has not shown that she was prejudiced by the introduction of these statements.

Marcie Murray contends that she should have been granted a severance because she was prejudiced by the fact that members of Don Hurt's family began to cry and display emotion in the presence of the jury. However, the record reveals that trial counsel for Ms. Murray noted that only one person, Don's daughter Lisa Baker, began to cry at a certain point. Apparently, Baker's actions were quiet enough that neither the trial court nor the prosecutor were aware that she had been crying. In any case, the record reveals that the trial court asked the court officer to discreetly take Baker out of the courtroom so that the jury would not notice her. Ms. Murray's brief is unclear about why this occurrence required a severance. Baker may well have cried at a separate trial. Regardless

of what might have happened at a separate trial, Ms. Murray has failed to meet her burden of showing how she was prejudiced by this apparently brief incident.

Marcie Murray contends that she should have been granted a severance because the trial court did not give limiting instructions after the testimony of each witness, but rather, gave a limiting instruction at the end of trial. As authority for this proposition, she cites State v. Little, 854 S.W.2d 643 (Tenn. Crim. App. 1992). However, Little does not contain any requirement that limiting instructions must always be given contemporaneously. Rather, it stands for the proposition that the jury should be adequately instructed to consider evidence separately as to each defendant. Although it may generally be a better practice to give contemporaneous limiting instructions, Ms. Murray has cited no Tennessee authority, and we are unaware of any, which requires this to be done in every single case. Because the trial court gave an appropriate limiting instruction at the end of trial, we find no reversible error in the failure to give contemporaneous instructions.

## B. Statement of James Murray

Sharon Hurt and Marcie Murray both contend that they should have been granted severance when the trial court allowed the introduction of James Murray's post-arrest attempts to make a deal with Detective Moran and his statement that he was going to plead guilty. Specifically, they claim that these statements were tantamount to him actually pleading guilty which prejudiced them in the eyes of the jury. They cite the cases of State v. Armes, 673 S.W.2d 174 (Tenn. Crim. App. 1984) and Bruton v. United States, 391 U.S. 123, 88 S. Ct.

1620, 20 L. Ed. 2d 476 (1968), in support of their claim. However, neither <u>Armes</u> nor <u>Burton</u> is applicable to this case. In <u>Armes</u>, this Court held that it was reversible error when a co-defendant changed his plea to guilty in the middle of the trial and the trial court took the plea in front of the jury. 673 S.W.2d at 178. In this case, however, James Murray did not plead guilty and the trial court certainly did not question him about this statement in front of the jury. Thus, this case is distinguishable from <u>Armes</u>. This case is also distinguishable from <u>Bruton</u>. In <u>Bruton</u>, the United States Supreme Court held that an inculpatory confession of a non-testifying co-defendant cannot be admitted in a joint trial. 391 U.S. at 126, 88 S. Ct. at 1622. However, <u>Bruton</u> does not apply to statements that do not implicate the non-confessing co-defendant. <u>State v. Person</u>, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989); <u>Dorsey v. State</u>, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978). In this case, James Murray's statements were simply his own admissions that did not even mention, much less implicate, the other Appellants. Thus, <u>Bruton</u> is inapplicable to this case and the trial court did not abuse its discretion in denying Sharon Hurt's and Marcie Murray's motions for severance on this ground.[4]

### C. Potential Testimony of Sharon Hurt

Marcie Murray contends that she should have been granted a severance so that she could have had the benefit of what she characterizes as Sharon

---

[4]Ms. Murray's claim that she was entitled to a limiting instruction that Mr. Murray's statements were not to be considered for the truth of the matter asserted is without merit. As an admission of a party, these statements were not hearsay, but were introduced as evidence of James Murray's guilt. <u>See</u> Tenn. R. Evid. 803(1.2)(A).

Hurt's exculpatory testimony. In her pre-trial motion to sever, Ms. Murray submitted the following affidavit from Sharon Hurt:

Based upon the advice of counsel and an independent decision made by me, I have chosen not to take the stand as a witness, but instead, I will be exercising my rights under the Fifth Amendment to the United States Constitution not to testify in my own behalf. Should I have chosen to testify, my testimony as concerns two (2) telephone calls made from Shoney's Restaurant on Long Hollow Pike in Goodlettsville, Tennessee on the night of June 10, 1991 would be as follows:

My husband, Don Hurt, and I stopped off at Shoney's Restaurant to have coffee and he had become aware that he was going to make a special run for Malone & Hyde, his employer, wherein he would be leaving the terminal around 12:00 AM on June 11, 1991. We had together made plans to visit my sister, Marcie Murray, and her husband, James Murray, in Sevierville, Tennessee on the 11th day of June, 1991, so I needed to advise them that we would not be making the trip to Sevierville because my husband had to make a special run to Memphis for his employer. At approximately 11:28 PM and 11:30 PM, we made calls from Shoney's Restaurant on separate telephones to my sister, Marcie Murray, in Sevierville and to Baptist Hospital in Knoxville where I thought she would be working. Don Hurt called the Sevierville residence and spoke to someone for approximately three (3) minutes. I called Baptist Hospital and was advised that my sister, Marcie Murray, was not working that night, and ended the conversation. To my knowledge, neither Marcie Murray nor James Murray were in the Nashville area on June 10 or 11, 1991.

Marcie Murray contends that in submitting this affidavit, she satisfied the following four part test for determining whether to grant severance based on calling a co-defendant as a witness:

The defendant must demonstrate: (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect, and (4) that the codefendant will in fact testify if the cases are severed.

United States v. Butler, 611 F.2d 1066, 1071 (5th Cir. 1980). This test has also been adopted by the United States Court of Appeals for the Sixth Circuit. See United States v. Causey, 834 F.2d 1277, 1287 (6th Cir. 1987). Although this test has never formerly been adopted by the courts of Tennessee, our courts have applied a similar test: the defendant must present the co-defendant's proposed testimony, demonstrate that it is exculpatory, and show that the co-defendant will

testify at trial if the cases are severed.  See State v. Ash, 729 S.W.2d 275, 279 (Tenn. Crim. App. 1987); State v. Holliday, No. 28, 1987 WL 9448, at *3 (Tenn. Crim. App., Jackson, June 29, 1987); State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982).  In this case, Ms. Murray has presented Ms. Hurt's proposed testimony.  However, neither her brief nor her pre-trial motion contains any argument explaining why this statement is exculpatory.  Indeed, even if Sharon and Don Hurt were the ones who made these telephone calls, the Murrays could still have followed Don on his westerly route in order to shoot him.  Further, this statement has absolutely nothing to do with the actual murder of Don Hurt six months later in December 1991.  Regardless of whether the statement is the least bit exculpatory, neither the affidavit nor anything else in the record indicates that Ms. Hurt would have waived her Fifth Amendment privilege against self-incrimination and actually testified if the case were severed. Therefore, the trial court did not abuse its discretion in refusing to grant the motion.

### D.  Trial Tactics of Sharon Hurt

Marcie Murray contends that she should have been granted a severance because counsel for Sharon Hurt advanced a defense theory that Sharon did not commit the crimes for money because she never made a claim for the insurance proceeds. Ms. Murray contends that she should have been granted a severance because this theory was "completely destroyed" by the testimony of the Hurts' insurance agent, Alvie Besch.  However, she cites no relevant authority to support her proposition that this was a basis for severance.  Further, she fails to indicate which part of the record contains the objectionable tactics of Sharon's counsel.  It does not appear that Sharon Hurt's defense theory was centered on

whether she made a claim for the insurance proceeds. Rather, it appears that her counsel merely pointed out by cross-examination questions that Don Hurt's family did not know for a fact whether Sharon had made an insurance claim. This line of questioning appears to have been part of an attempt to show that Don Hurt's family wanted the money for themselves. These questions may not have been the most prudent in light of the fact that Besch later testified that Sharon did put in an insurance claim, however, the mere fact that counsel for a co-defendant asked a few questions on cross-examination that were later rebutted by the State's evidence is insufficient to show prejudice justifying severance.

### E. Missing Witness Instruction

Marcie Murray contends that she was entitled to a severance based on the trial court's decision to give a missing witness instruction regarding Pam Woolums.[5] She claims that severance was the proper remedy because Woolums was listed as an alibi witness by James Murray and the missing witness instruction was thereby directed at him. She argues that she should not be penalized for relying on James Murray's assurances that Woolums would be present at the trial, which caused her not to subpoena Woolums for herself. However, Ms. Murray fails to support this argument, which is apparently an attempt to appeal to overall notions of fairness, with any legal authority. Moreover, the record does not support her contention that only James listed Woolums as a witness. The record does not contain the defense alibi notices, and therefore, there is no documentation regarding which witnesses were listed

---

[5]Ms. Murray does not contend that the trial court erred in giving this instruction and for the reasons stated in Part XIV, infra, we hold that it was not error to give this instruction.

by which Appellant. Further, the prosecutor's statements at the end of the hearing on this jury instruction suggest that both James and Marcie Murray may have listed Woolums as a witness. In fact, Marcie Murray is the one who testified that she and James were eating dinner with Woolums in Gatlinburg, Tennessee when Don Hurt was murdered. Ms. Murray's trial counsel acknowledged to the court that he simply relied on the assurances of counsel for James that Woolums would be available to testify and that he would have subpoenaed her himself if he had known that she had not been properly subpoenaed. Ms. Murray's reliance upon the actions and representations of counsel for Mr. Murray is clearly her own fault, and she may not now claim that she was entitled to severance for a problem that she could have avoided herself. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## F. Disparity of Evidence

Marcie Murray contends that she should have been granted a severance because she was prejudiced by the fact that the evidence against her was slight in comparison to the evidence against Sharon Hurt. In support of this broad argument, she cites to Zafiro v. United States, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). In Zafiro, the United States Supreme Court stated that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, th[e] risk of prejudice [from joint trials] is heightened." Id. 506 U.S. at 539, 113 S. Ct. At 938. However, this Court has stated that where the charges against the defendants are neither numerous nor

complex and the evidence shows that the defendant played a central role in the commission of the offense, we will not find a trial court's denial of severance to be prejudicial. See State v. Steve Ketron, No. 955, 1991 WL 83363, at *2–3 (Tenn. Crim. App., Knoxville, May 22, 1991); State v. Melvin Alexander, No. 88-290-III, 1990 WL 26769, at *4–5 (Tenn. Crim. App., Nashville, March 15, 1990). Such is the case here. This case involved only three defendants and a sequence of events that was fairly easy to follow. Further, the evidence revealed that Ms. Murray played a central role in the commission of the offenses at issue here. As this Court has stated, "a disparity of incriminating evidence is not itself sufficient to establish prejudice" for severance purposes. Ketron, 1991 WL 83363 at *2; Alexander, 1990 WL 26769 at *4. Thus, this issue has no merit.

## III. SUFFICIENCY OF THE EVIDENCE

Appellant James Murray contends that the evidence was insufficient to support his convictions for first degree murder and conspiracy to commit first degree murder.[6]  Specifically, Mr. Murray contends that: a) the first degree murder conviction is invalid because there was no proof of deliberation, b) that both convictions were based on uncorroborated accomplice testimony, and c) that the circumstantial evidence presented was too tenuous to exclude all reasonable theories besides that of guilt.

When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony

---

[6]Appellants Sharon Hurt and Marcie Murray do not challenge the sufficiency of the evidence.

of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with Appellant to demonstrate the insufficiency of the convicting evidence. Id. On appeal, "the [S]tate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Harris, 839 S.W.2d at 75; Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." Id. at 779. Finally, Rule 13(e) of the Tennessee Rules of Appellate Procedure provides, "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact beyond a reasonable doubt." See also Matthews, 805 S.W.2d at 780.

## A. Deliberation

James Murray claims that the evidence is insufficient to support his first degree murder conviction because there was no proof of deliberation. We disagree. When Don Hurt was murdered in 1991, Tennessee's first degree murder statute provided that "[f]irst degree murder is: [a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (1991).[7] Deliberation requires that the offense be committed with cool purpose, free of the passions of the moment. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). In addition, deliberation is a determination for the jury which may be inferred from the manner and circumstances of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Facts showing the defendant's planning activity, motive, and nature of the killing can all provide evidence from which deliberation can be inferred. See State v. Gentry, 881 S.W.2d 1, 4–5 (Tenn. Crim. App. 1993). Leonard Rowe testified that Sharon Hurt told him in February 1991 that she had offered to pay James and Marcie Murray for killing her husband and that the Murrays told him that Don owed them money and they were going to "kill the son-of-a-bitch." Rowe also testified that on the day of the murder, James Murray had borrowed his gun and had subsequently stated that he had used the gun to kill Don Hurt after putting "mickeys" in his drinks and placing him in his car. Further, the State presented evidence that James Murray murdered Don Hurt after he had already attempted to kill him approximately six months earlier by shooting him with a shotgun. The jury could reasonably infer from this evidence that James Murray had a motive to kill Don Hurt, that he planned the murder, and that he committed the murder by carrying out his plan.

---

[7]A 1995 amendment eliminated deliberation as an element of first degree murder. See Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1998) ("First degree murder is: A premeditated and intentional killing of another.").

Thus, there was sufficient proof of deliberation for the jury to conclude that James Murray was guilty of first degree murder.

## B. Corroborating Evidence

James Murray contends that his convictions for first degree murder and conspiracy to commit first degree murder are invalid because they are based solely on the uncorroborated testimony of an accomplice.[8] We disagree. The appellate courts have addressed the nature, quality, and sufficiency of the evidence required to corroborate the testimony of an accomplice on numerous occasions. In State v. Griffis, 964 S.W.2d 577 (Tenn. Crim. App. 1997), this Court stated:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.
> . . . .
> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

Id. at 588–89 (citations omitted). "Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as trier of fact." State

---

[8]The trial court found as a matter of law that Leonard Rowe was the Appellants' accomplice. That conclusion has not been challenged.

v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citing Stanley v. State, 189 Tenn. 110, 222 S.W.2d 384 (1949)).

The evidence in this case clearly established at least the "slight circumstances" required to corroborate Rowe's accomplice testimony.  As for the first degree murder conviction, some corroborating evidence came from James Murray himself.  Indeed, we he was arrested, he stated that he was "glad it's over with" and that he "wanted to make a deal."  He subsequently stated, "Well, what kind of deal can I get when I'm going to plead guilty."  Rowe's statement that James Murray told him that he had put "mickeys" in Don Hurt's drink before killing him was corroborated by Doctor Harlan who testified that when Don was killed, he had a high level of Benadryl in his blood that would have made him drowsy.  Rowe's statement that James Murray told him that he and Marcie both shot Don in the head with Rowe's gun was corroborated by testimony that the two bullets that penetrated Don's brain were fired from a .38 caliber pistol and were fired from different angles.

The evidence listed above also corroborates Rowe's testimony in regard to the conspiracy conviction.  In addition, other evidence was introduced that corroborates Rowe's testimony.  Rowe's statement that James Murray told him that he shot Don Hurt with a 12-gauge shotgun in June 1991, was corroborated by several facts.  First, Don told the police that he had been shot by someone in a red Camaro or Firebird and in fact, the Murrays owned a red Firebird.  Further, Joey Rowe testified that in Fall 1991, he heard James Murray state that he did not understand "How it didn't kill him from a shot that short of distance."  In addition, James told Detective Moran in a taped telephone conversation that he

made the phone calls from the restaurant near Malone & Hyde Trucking on May 10, 1991, just hours before Don Hurt was shot. Finally, a firearms specialist examined the slug from Don's truck and determined that it was a unique type of shell which is typically fired from a 12-gauge shotgun.

In short, there was sufficient evidence before the jury as the trier of fact to determine that Rowe's testimony was sufficiently corroborated.[9]

## C. Circumstantial Evidence

James Murray contends that his convictions should be reversed because they were based entirely on circumstantial evidence. However, the Tennessee Supreme Court has stated that the State may prove a criminal offense by circumstantial evidence alone. State v. Mann, 959 S.W.2d 503, 518 (Tenn. 1997) (citing State v. Tharpe, 726 S.W.2d 896, 899–900 (Tenn. 1987)). This includes the offense of first degree murder. State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). "Before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances 'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" Mann, 959 S.W.2d at 518 (quoting State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971)). "As in the case of direct evidence, the weight to be given circumstantial evidence and '[t]he inferences to be drawn from such evidence, and the extent to which the

_____

[9]James Murray's argument that Rowe's testimony that Rowe gave him the .38 caliber pistol he used to kill Don Hurt must be specifically corroborated is without merit. This Court has previously stated that "[i]t is not necessary that the corroboration extend to every part of the accomplice's evidence." State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Id. (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958)).

In this case, it is obvious that the jury believed the testimony of Leonard Rowe. As previously stated, Rowe's testimony established that Sharon Hurt had offered to pay the Murrays for killing Don Hurt; that James Murray shot Don Hurt during the failed murder attempt of June 11, 1991; that James Murray borrowed Rowe's gun on December 19, 1991; that James Murray participated in drugging Don Hurt and placing him in the gold car; and that James Murray shot and killed Don Hurt with Rowe's gun on December 19, 1991. In addition, other evidence established that James Murray had been near Don Hurt's place of business just hours before he was shot on June 11, 1991; that James Murray owned a car that matched the description of the car used in the failed murder attempt; and that James Murray told the police that he was guilty of the crimes in this case. From this evidence, we find that the jury acted within its prerogative in determining that all other reasonable hypotheses, save the guilt of the accused, had been excluded beyond a reasonable doubt. This issue has no merit.

## IV. STATEMENTS OF JAMES MURRAY

Appellant James Murray contends that the trial court erred when it admitted his post-arrest statements into evidence. Specifically, he claims that this was error because a) the police failed to cease questioning him after giving Miranda warnings, b) the police continued to question him after he invoked his right to

counsel, and c) the statements were inadmissible offers to enter into plea negotiations.

## A. Miranda

Initially, James Murray argues that the statements he made to Detective Moran should have been suppressed because Moran continued to question him after giving him the Miranda warnings. In Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966), the United States Supreme Court ruled that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating questioning, to advise the putative defendant of his right to remain silent and his right to counsel. If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293 (1994).

Moran testified that immediately after Mr. Murray was arrested and read the charges in the indictment, he told Moran "I knew that it was over when I saw the two [Kentucky State Police] cars parked down the street, and I'm glad its over with." Mr. Murray apparently made this statement before the Miranda warnings were given. However, there is no indication in the record, and it is not even argued, that this statement was anything other than a spontaneous declaration. As this Court has stated, spontaneous statements "are admissible in evidence whether or not Miranda warnings were first given." State v. Brown, 664 S.W.2d 318, 320 (Tenn. Crim. App. 1983). See also State v. Ensley, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1997) ("statements which are spontaneous and

volunteered are admissible in the absence of Miranda warnings"). Thus, this statement was clearly admissible.

Moran testified that after he took Mr. Murray to the Kentucky State Police headquarters and advised him of his rights, Mr. Murray stated "that he knew some information in this case, that he wanted to help, but he wanted to make a deal." Moran then told Mr. Murray that he could not make any deals because he was not the district attorney general. Mr. Murray then asked if he could talk to another detective in private.[10] After he talked to the other detective, Mr. Murray came back into the room and said to Moran, "I've got some information in this case and I think I can get a better deal if I had a lawyer." At his point, Moran terminated the interview. Although the right to counsel and the right against self-incrimination are constitutional rights, they may be waived, provided the waiver is made "voluntarily, knowingly, and intelligently." State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992) (citing Miranda, 384 U.S. at 444, 86 S. Ct. at 1612)). "A waiver is valid if the suspect is aware of the nature of the right being abandoned and the consequences of the decision to abandon the right." State v. Stephenson, 878 S.W.2d 530, 547 (Tenn. 1994). The totality of the circumstances must be examined to determine whether the choice was uncoerced and whether the person understood the consequences of his decision. Id. at 545. In this case, there is no evidence in the record, and it is not even argued, that Mr. Murray ever invoked his right to remain silent. Mr. Murray does not argue that he did not understand either his rights or the consequences of

[10]The record indicates that Mr. Murray spoke to Detective John Sparks of the Kentucky State Police, whom he had apparently known for a number of years. However, nothing in the record indicates what was said during this conversation and the parties do not suggest that it has any relevance to the determination of this issue.

waiving them. Further, Mr. Murray has failed refer to anything in the record that might indicate that he was coerced into waiving his right to remain silent. Although Detective Moran apparently failed to obtain a written waiver, the law does not require one. State v. Mann, 959 S.W.2d 503, 529 (Tenn. 1997). In short, there is nothing in the record that indicates that these statements were anything other than voluntary and spontaneous. Thus, these statements were properly admitted.

## B. Sixth Amendment Right to Counsel

James Murray argues that certain statements he made to Detective Moran when he was being transported to Tennessee were inadmissible because they were obtained in violation of his Sixth Amendment right to counsel. The United States Supreme Court held in Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) that "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." 451 U.S. at 485, 101 S. Ct. at 1888. If an accused remains silent and cuts off questioning, that silence must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). If, on the other hand, a statement is made after the invocation of the right to counsel, the court must consider whether the accused initiated the further conversation, and whether, given the totality of the circumstances, the waiver of counsel was knowing and intelligent. Oregon v. Bradshaw, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983).

Detective Moran testified that after James Murray told him, "I've got some information in this case and I think I can get a better deal if I had a lawyer," Moran terminated the interview. The next time Moran saw Mr. Murray was when Moran went to Kentucky in order to transport Mr. Murray back to Tennessee. Moran testified that after he put Mr. Murray in the police vehicle, he told Mr. Murray that they had a long trip and that because Mr. Murray had previously requested an attorney, he would honor that request and he would not be asking any more questions.[11] Mr. Murray then stated that he had some information and he wanted to make a deal. At this point, Moran stated "Jimmy, I cannot negotiate a deal with you. I'm a police officer. I'm not the D.A." Moran testified that Mr. Murray then lowered his head, stared off into space, and said, "Well, what kind of deal can I get anyway when I'm going to plead guilty." Moran testified that Mr. Murray was not addressing him when he made this statement. It is apparent that these statements were not obtained in violation of Mr. Murray's Sixth Amendment right to counsel. The record indicates that despite being told several times that Detective Moran could not make any deals, Mr. Murray continued to try to make one. There is nothing in the record which indicates that Mr. Murray's statement that he was "going to plead guilty" was involuntary or coerced. In fact, the record indicates that this statement was not made in response to anything done by Moran. It appears that this statement was a spontaneous declaration that was made while Mr. Murray was basically talking to himself. In short, we hold that these statements were made after James Murray validly waived his right to counsel and thus, the statements were admissible.

---

[11]It does not appear from the record, and it is not argued, that this statement by Moran was calculated to elicit incriminating statements or induce James Murray to waive his asserted rights. See Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

## C. Rule 11(e)(6)

James Murray contends that his statements were inadmissible under Rule 11(e)(6) of the Tennessee Rules of Criminal Procedure because they were offers to enter into plea negotiations.[12]  We disagree.  Rule 11(e)(6) states:

> Inadmissibility of Pleas, Offers of Pleas, and Related Statements.  Except as otherwise provided in this paragraph, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.

Tenn. R. Crim. P. 11(e)(6).  Before Rule 11(e)(6) can be invoked to exclude statements made by an accused, the statements must be "made in connection with, and relevant to" a plea of guilty or a plea of nolo contendere.  Therefore, this Rule is inapplicable in this case because, as a police officer, Detective Moran could not have entered into a plea bargain agreement with Mr. Murray.  See State v. James Wayne Butler, No. 01-C-01-9301-CR-00023, 1993 WL 345551, at *4 (Tenn. Crim. App., Nashville, Sept. 9, 1993).  This issue has no merit.

## V. PRIOR BAD ACTS

Appellant Marcie Murray contends that the trial court should have granted her motion for a mistrial or curative instructions when Frank Ensworth, an administrator at Baptist Hospital, briefly mentioned an investigation involving Ms. Murray and alluded to a "disciplinary action."  She claims that this raised a

---

[12]As authority for this proposition, Mr. Murray cites two federal cases, United States v. Brooks, 536 F.2d 1137 (6th Cir. 1976) and United States v. Herman, 544 F.2d 791 (5th Cir. 1977).  Both of these cases have been superseded by statute/rule.  See United States v. Sebetich, 776 F.2d 412, 421 (3d Cir.1985).

"spectre of other crimes" that unfairly prejudiced her. The disputed testimony was as follows:

> Q: And the record of Marcie Murray, do you show her address and phone number on that particular record?
> A: on several of the documents, there are phone numbers; yes.
> Q: Okay. Would you tell the jury what the address is reflected on your records, and the phone number?
> A: Originally, we have a route 15, Box 576, Pigeon Forge, with a phone number of 429-0074, and later on, there was an investigative report--
> Q: That's okay sir.

Ensworth then went on to testify that Marcie had an unexcused absence from work on June 10, 1991, and that she received a "disciplinary letter" because of this. Ms. Murray moved for a mistrial after both of these statements.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). We agree with the trial court that a mistrial was not required in this situation. As acknowledged by defense counsel at trial, there is no indication that the State sought to evoke testimony about the investigative report or disciplinary action. Rather, it appears that the State sought to have Ensworth testify that Marcie had taken off June 10th without any notice to her employer and had taken June 11th off as well. It appears that Ensworth merely mentioned the investigative report in response to questions and there was no further discussion of the report. Moreover, the mere fact that Marcie missed work and was written up by her employer did not constitute a prior bad act under Rule 404(b) of the Tennessee Rules of Evidence, which states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with that character trait." Being written up for missing work is simply not the kind of prior bad act that Rule 404(b) is concerned with. Even

if it was, the State introduced this evidence to show that Marcie had no alibi for June 10 and 11, 1991. The state was not seeking to demonstrate that because Marcie had a tendency to miss work, she was therefore a murderer. In short, Ms. Murray has not shown that she was prejudiced by the very limited mention of the investigative report and disciplinary letter.[13]

## VI. SEIZURE OF THE MURRAY'S VEHICLE

Appellants James and Marcie Murray contend that the trial court erred when it admitted evidence regarding the seizure of their red Firebird from the property of a third party in March 1993. The evidence they object to came in through the testimony of Captain Randy Parton of the Sevier County Sheriff's Office. Parton testified that in March 1993, he impounded James Murray's red 1982 Firebird, which he discovered in the barn of a third party just off Highway 139 in Sevier County. He then identified a few photographs of the car that were entered into evidence. Marcie Murray claims that this evidence should not have been admitted because the seizure of the car was illegal because no warrant was issued. James Murray argues that because the seizure occurred fourteen months after the murder and because the car was only driven by his son, this evidence was more prejudicial than it was probative.

As to the claim of Ms. Murray, it is evident that she lacks standing to contest evidence of the discovery of the vehicle in the barn. When challenging the reasonableness of a search or seizure, the defendant has the burden of first

---

[13]Ms. Murray also complains that she was not provided with the disciplinary report prior to Ensworth's testimony. However, any error in this failure was harmless in light of the fact that the report was not introduced into evidence and no further reference was made to it.

establishing a legitimate expectation of privacy in the place or property which is searched. Rawlings v. Kentucky, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561, 65 L. Ed. 2d 633 (1980); State v. Roberge, 642 S.W.2d 716, 718 (Tenn. 1982). This Court has held that the following seven factors are applicable to the standing inquiry:

(1) property ownership;
(2) whether the defendant has a possessory interest in the thing seized;
(3) whether the defendant has a possessory interest in the place searched;
(4) whether he has a right to exclude others from that place;
(5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion;
(6) whether he took normal precautions to maintain his privacy; and
(7) whether he was legitimately on the premises.

State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991). In this case, although the car was seized, no evidence was introduced about whether anything was found in the car itself. Thus, the barn was the thing that was searched and the only evidence introduced about the car, other than a few photographs, was that it was found in the barn and it belonged to James Murray. Ms. Murray clearly fails the above test for determining standing. The barn itself was on the property of a third party and there was no evidence that Ms. Murray had any possessory interest in the barn. In fact, the only evidence introduced on this point indicates that the car had been left in the barn without the owner's permission. Indeed, there was no evidence that Ms. Murray exhibited any subjective expectation that the barn would remain free of government intrusion or that she did anything to prevent such an intrusion. Finally, Ms. Murray did not own the car and she claimed in her direct testimony that her son was the only one who drove the car. Thus, Ms. Murray does not have standing to contest the search of the barn and the fact that James' car was found in the barn.

James Murray claims that because the car was found fourteen months after Don Hurt's murder, this evidence should have been excluded because it was too remote and thus, its admission would mislead the jury.[14] We disagree. Evidence presented at trial indicated that Don Hurt was shot on June 11, 1991, by someone in a red or orange Firebird or Camaro type vehicle and that the Murrays were driving a red Firebird or Trans Am in the Fall of 1991. The evidence that James Murray did in fact own a red Firebird is directly relevant to establishing that he participated in the June 11, 1991 shooting. It is difficult to see how the fact that the police did not discover this car and photograph it until March 1993 makes the photographs and the testimony about its discovery too remote to be admissible. However, even if this evidence was slightly remote, any prejudice caused by its remoteness did not substantially outweigh its obvious probative value. See Tenn. R. Evid. 403. Thus, the trial court was correct when it admitted this evidence. This issue has no merit.

## VII. ADMISSION OF A SHOTGUN SHELL

Appellant James Murray contends that the trial court erred when it admitted a "sabot" shotgun shell into evidence. However, this issue is waived because he failed to object to the admission of this shell at the time it was offered by the State. See Tenn. R. App. P. 36(a). However, even on the merits, the admission of the shell was not improper. Mr. Murray contends that because this shotgun shell was found in the possession of his son thirteen months after Don Hurt's murder, its introduction violated Rule 403 of the Tennessee Rules of Evidence

---

[14]Mr. Murray does not contest the legality of either the search of the barn or the seizure of his vehicle.

by misleading the jury into thinking that there was some connection between Mr. Murray and the shell. The record reveals that the shell was used mainly to assist a firearms expert in describing the markings placed on these types of shells by the manufacturer. There was absolutely no testimony about where or how this shell was obtained. Thus, there was no way for the jury to connect this shell to either Mr. Murray or his son. This issue is without merit.

## VIII. PROSECUTORIAL MISCONDUCT

Appellants Sharon Hurt and Marcie Murray contend that their due process rights to a fair trial were violated because the State withheld material evidence that was favorable to their case and knowingly used perjured testimony. Specifically, they allege that they should have been granted a new trial because the State instructed Rowe not to reveal the full extent of his agreement with the State when he testified at trial and because the State knowingly used Rowe's perjured testimony about the agreement he had with the State.

Ms. Hurt and Ms. Murray base their claims on two sworn statements given by Leonard Rowe on August 1 and August 27, 1996, over one year after the trial. The statement of August 1st was given to counsel for Ms. Hurt and the statement of August 27th was given to counsel for Ms. Hurt and counsel for Ms. Murray. These statements were given in the presence of a court reporter, but no representative of the State was present to cross-examine Rowe during either statement. In the first statement, Rowe claimed that during the trial, he "was under a lot of pressure on the witness stand, threats, if [he] didn't convince the jury that [Appellants] were guilty, the D.A. was going to burn [his] ass." In

addition, he said that the prosecutor promised him a letter of recommendation so that he would make parole at the earliest possible date. Rowe stated that he believed that this meant that he would only "do a little bit more jail time," although he admitted that there was never any discussion of how much time he would actually serve. Rowe also claimed that he was "tutored" by the prosecutor as to what to say at trial and the prosecutor "put words in [his] mouth." Rowe claimed that he did not tell the truth at trial, but he refused to specify what he had been untruthful about. Rowe also stated that he felt that the State had not lived up to its promises, but he refused to say why that was the case. In the second statement, Rowe reiterated these claims and stated that the prosecutor specifically told him not to reveal the fact that he had made a deal with the State. Despite making these allegations, Rowe invoked his Fifth Amendment privilege against self-incrimination and refused to testify during the hearing on the Motion for a New Trial.

We conclude that the trial court properly refused to grant the Motion for a New Trial based on Rowe's affidavits. As this Court has previously stated,

> A motion for a new trial is only a pleading. An affidavit, such as the one in this case, is merely an exhibit to such motion. To show the existence of this evidence, proof must be offered by the moving party. To grant relief on affidavits only would deny the opposing party an opportunity to test the accuracy or veracity of the information contained therein by confrontation or by evidence contrary to this assertion. The trial judge properly denied the motion for a new trial on this ground.

Hicks v. State, 571 S.W.2d 849, 852 (Tenn. Crim. App. 1978). See also State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim App. 1995) (citing Hicks, 571 S.W.2d at 852) ("the trial court should not determine the merits of the petition on the strength of the affidavits alone"). Further, under Rule 33 of the Tennessee Rules

-42-

of Criminal Procedure, the mere incredibility of an affidavit is sufficient for a trial court to disregard it and require an evidentiary hearing on the matter. See Tenn. R. Crim. P. 33 (comment) ("The judge is not required to believe an incredible affidavit and may always require an evidentiary hearing with witnesses.").[15] In this case, Appellants were granted an evidentiary hearing, but Rowe refused to testify. Thus, the only evidence presented to the court on this claim was contained in the affidavits which were made without the presence of the State's attorney. Therefore, the trial court properly refused to grant Appellants a new trial based on the allegations made in the affidavits.[16]

## IX. NEWLY DISCOVERED EVIDENCE

Appellants Sharon Hurt and Marcie Murray contend that the trial court erred when it refused to grant them a new trial based on what they characterize as newly discovered evidence. They base their claim on a sworn statement given by Carrie Sims on March 1, 1996. In her statement, Sims asserted that her husband had confided in her that he had killed Don Hurt as a favor to a man named "Cowboy" after he had shot and wounded Don Hurt six months earlier. Sims stated that she decided to come forward with this story after she met Ms. Hurt and Ms. Murray while she was incarcerated and she "put two and two together."

---

[15]We have reviewed Rowe's affidavits and we agree that the unsupported allegations they contain are simply not credible. This is especially true in light of the fact that both Rowe and his counsel testified at trial that there was no secret agreement with the State.

[16]Because we conclude that there was no credible evidence that Rowe had any secret agreement with the State, we need not address the potential consequences of purposefully concealing such an agreement.

The trial court properly refused to grant a new trial based on this statement for the same reason that it properly refused to grant a new trial based on Rowe's sworn statements. Sims' sworn statement was also taken without the presence of an attorney for the State and Sims also refused to testify at the hearing on the Motion for a New Trial. As a result, the trial court decided not to consider the statement because there was no way to test its veracity without Sims' testimony. This was clearly within the court's discretion. See Hicks, 571 S.W.2d at 852; Tenn. R. Crim. P. 33 (comment). See also Hart, 911 S.W.2d at 852 ("If the trial court does not believe that the witnesses presented by the accused are credible, the court should deny [relief].").[17] This issue has no merit.

## X.  DENIAL OF FUNDS FOR EXPERT SERVICES

Appellants Sharon Hurt and Marcie Murray contend that the trial court erred in denying their motion for state funds to employ the services of an expert in the field of pathology/toxicology. Specifically, they argue that this denial violated their due process rights to a fair trial because they were unable to contest the State's proof that the level of Benadryl in Don Hurt's system at the time he was killed was many times higher than the normal therapeutic level.

At the time of Appellants' motion in December 1994, Tennessee law did not provide for such expert assistance in non-capital cases, and the trial court properly denied the motion. See Tenn. Code Ann. § 40-14-207(b) (1997) (allowing for authorization of funds for expert services only in capital cases); see

---

[17]We have examined Sims' sworn statement and, if anything, it is even less credible than Rowe's sworn statements.

also State v. Williams, 657 S.W.2d 405, 411 (Tenn. 1983); State v. Harris, 866 S.W.2d 583, 585 (Tenn. Crim. App. 1992). On appeal, however, Appellant relies upon State v. Barnett, 909 S.W.2d 423 (Tenn. 1995), a Tennessee Supreme Court case which post-dates the trial court's ruling. In Barnett, the supreme court held that, where an indigent defendant's need for a state-paid psychiatric expert touches upon a due process concern, a trial court may order such services even in non-capital cases, provided the defendant can demonstrate a "particularized need." Id. at 431. While Barnett dealt with a psychiatric expert, this Court has previously extended the reasoning of Barnett to other forms of expert assistance. See State v. James W. Jacobs, No. 01C01-9601-CC-00048, 1997 WL 576493, at *2 (Tenn. Crim. App., Nashville, Sept 18, 1997) (citations omitted). Because Barnett constitutes a new constitutional rule, it must be applied retroactively to Appellants' case. See id.

Ms. Hurt and Ms. Murray rely on a motion of December 15, 1994, which was supported by an affidavit of counsel, to show that they met the Barnett requirement of demonstrating "particularized need." Although the motion and affidavit are included, the record does not contain a transcript of the proceedings or an order of the trial court denying the motion. It is the duty of the party seeking appellate review to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues raised by the party. State v. Ballard, 855 S.W.2d 557, 560–61 (Tenn. 1993); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). When the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, this Court is precluded from considering the issue. State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981). Instead, this Court must conclusively presume

the ruling of the trial court denying a motion was correct. Ballard, 855 S.W.2d at 560–61; Roberts, 755 S.W.2d at 836. Even on the merits, it appears that Appellants could not have established a "particularized need." Appellants argue on appeal that they had a "particularized need" because a lab report from the Tennessee Bureau of Investigation indicated that the level of Benadryl in Don Hurt's system was therapeutic, which contradicted Doctor Harlan's testimony that the level was many times greater than the therapeutic level. However, Appellants' counsel could have called either the analyst who prepared the report, the analyst who told him that the report indicated a therapeutic level of Benadryl, or their supervisor. It appears that counsel merely elected not to, fearing that their testimony would be more damaging than helpful. It appears that what Appellants are really contending is that they needed expert assistance to refute the State's proof. However, when a motion for expert assistance is "accompanied by little more than undeveloped assertions that the services [are] needed to attempt to counter the State's proof," the trial court is within its discretion in denying the request. Barnett, 909 S.W.2d at 430. Thus, this issue has no merit.

### XI. "THEY DID STUFF LIKE THIS BEFORE"

Appellant Sharon Hurt contends that the trial erred when it refused to grant a mistrial after Rowe testified that "they did stuff like this before." Specifically, she argues that this reference to "they" made it seem as if she had killed someone before.

The record indicates that prior to Rowe's testimony, the State agreed to question Rowe only generally as to why he did not testify truthfully in prior

proceedings and not to question Rowe as to the specifics behind the reason.

During Rowe's direct examination, the following colloquy occurred:

> Q: Mr. Rowe, I'll ask you, while you were in Tallahassee, Florida, did you
> have an occasion to discuss the murder of Don Hurt?
> A: Sharon and I, one afternoon we went to a seafood restaurant and had
> dinner, and when we finished dinner and got back out in the car, and I
> asked Jimmy Murray directly what happened and he told me how they had
> put mickeys in Don Hurt's drinks and how the three of them walked him to
> the front door and he shot Mr. Hurt in the head and Marcie shot him in the
> head, and he said the reason both of them shot him was where they
> couldn't tell on one another.
>                 . . . .
> Q: Were any statements made to you about what would happen to you if
> you told anybody?
> A: Yes, sir.  They said that they did stuff like this before--
> Q: No, if Your Honor please--

The prosecutor then told the court in a bench conference that he had repeatedly gone over the parameters of Rowe's testimony with him and that he had given this answer despite these admonitions. Ms. Hurt then moved for a mistrial, which was denied.  The court then gave the following instruction, "The last response of the witness is to be stricken from the record and stricken from the jury's consideration."  The court then told the prosecutor to leave that question and move on to something else, which he did.

The decision of whether to grant a mistrial is within the sound discretion of the trial court.  State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996).  This court will not disturb that decision absent a finding of abuse of discretion.  State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).  Furthermore, we presume that the jury followed the trial court's explicit instruction not to consider the inappropriate comment.  State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994).  In fact, although Rowe's statement was somewhat ambiguous, the logical inference

when the statement is taken in context is that he was referring to the Murrays, not to Ms. Hurt. In light of the limited nature of the offending testimony and the trial court's prompt curative instruction, the trial court did not abuse its discretion in refusing to grant a mistrial. See State v. Dick, 872 S.W.2d 938, 944 (Tenn. Crim. App. 1993). This issue has no merit.

## XII. IMPEACHMENT TESTIMONY

Appellant Marcie Murray contends that the trial court erred when it ruled that she could not impeach Rowe with the testimony of Lanny Clark. Specifically, Ms. Murray contends that Clark should have been allowed to testify that Rowe had offered him $2,500 to either shoot or find someone else to shoot a man named Cotton Murray.[18]

During a jury-out hearing, Rowe was cross-examined about whether he ever attempted to hire Clark to shoot Cotton Murray. Rowe denied the allegations. The trial court ruled that defense counsel could cross-examine Rowe about the allegations, but that no extrinsic evidence would be permitted. Rowe was subsequently cross-examined about the allegation, and he once again denied it. Later, defense counsel proffered Clark's testimony, but the court reiterated its finding that this evidence was not admissible because it related to a collateral matter.

---

[18]Cotton Murray was apparently not related to James and Marcie Murray.

Ms. Murray contends that Clark's testimony did not concern a collateral matter because it went to Rowe's knowledge and ability to employ someone to maim or kill another person. We agree with the trial court that this evidence was purely collateral. There was absolutely no proof that Rowe had hired or attempted to hire someone to kill Don Hurt. Thus, the only relevance of Clark's testimony would be to show that Rowe had lied about trying to hire Clark to shoot Cotton Murray. Essentially, Ms. Murray is arguing for what Rule 608(b) of the Tennessee Rules of Evidence was designed to prohibit. Rule 608(b) states:

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified.

Tenn. R. Evid. 608(b). Thus, Clark's testimony regarding this collateral matter was clearly inadmissible under Rule 608(b). This issue has no merit.

## XIII. FAILURE TO PROVIDE CRIMINAL RECORDS OF WITNESSES

Appellant Marcie Murray contends that the trial court erred when it denied her motion requesting that the State be required to produce the criminal records of all of its witnesses. Ms. Murray acknowledges that under State v. Workman, 667 S.W.2d 44, 51 (Tenn. 1984), the State has "no duty, either under the Tennessee Rules of Criminal Procedure or by decisional law in this state," to provide such disclosure. She contends, however, that this disclosure is required by federal constitutional law.

As support for her proposition, Ms. Murray cites Wardis v. Oregon, 412 U.S. 470, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973) and United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). However, neither of these cases holds that the prosecution has an absolute duty to disclose the criminal records of its witnesses to the defense. Wardis stands for the proposition that discovery rules must be reciprocal. 412 U.S. at 472, 93 S. Ct. at 2211. Thus, that case is inapplicable here because Tennessee law does not require the defense to divulge the criminal records of its witnesses while exempting the State from doing the same. Agurs stands for the proposition that criminal records of a witness or victim must be disclosed when they are material. 427 U.S. at 111–12, 96 S. Ct. at 2401–02. However, the Court specifically noted that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 427 U.S. at 109–10, 96 S. Ct. at 2400.

The Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97, 10 L. Ed. 2d 215 (1963). In addition, the Court has stated that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972) (citation omitted). "Such evidence is 'evidence favorable to an accused,' Brady, 373 U.S. at 87[, 83 S. Ct. at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct.

3375, 3380, 87 L. Ed. 2d 481 (1985). However, before an accused is entitled to relief under this theory, he must establish several prerequisites: a) the prosecution must have suppressed the evidence; b) the evidence suppressed must have been favorable to the accused; and c) the evidence must have been material. See Bagley, 473 U.S. at 674–75, 105 S. Ct. at 3379–80; Agurs, 427 U.S. at 104, 96 S. Ct. at 2397; Brady, 373 U.S. at 87, 83 S. Ct. at 1196–97. In State v. Spurlock, this Court recognized a fourth prerequisite to relief: "the accused must make a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused." 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993) (citations omitted). Moreover, the defendant has the burden of proving a constitutional violation by a preponderance of the evidence. Id. at 610.

In this case, Marcie Murray has shown that she made a request for the witnesses' criminal records. However, she has not presented any evidence, or even argued, that any of the State's witnesses actually had criminal records for the State to suppress. Further, she has failed to explain how such records would have been material. Thus, even if the trial court had erred in denying her motion, Ms. Murray has failed to establish how she was prejudiced by the denial.[19] In short, Ms. Murray has failed to establish that her due process right to a fair trial was violated by the trial court's denial of her motion for the disclosure of the witnesses' criminal records. This issue has no merit.

_____

[19]We are unconvinced by Ms. Murray's argument that due process requires disclosure in every case because the State has a monopoly on this information. To the contrary, Ms. Murray could have obtained some of this information herself with the exercise of reasonable diligence. See Tenn. Code Ann. § 40-32-101(c)(3) (Supp. 1998) ("Release of arrest histories of a defendant or potential witness in a criminal proceeding to an attorney of record in the proceeding shall be made to such attorney on request.").

## XIV. MISSING WITNESS INSTRUCTION

Appellant James Murray contends that the trial court erred when it gave the missing witness instruction regarding Pam Woolums. We disagree. "Under the missing witness rule, a party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions." State v. Middlebrooks, 840 S.W.2d 317, 334 (Tenn. 1992) (citations omitted). "Before the missing witness rule can be invoked, however, the evidence must show that 'the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial.'" Id. (quoting Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979)). It has frequently been noted that the missing witness rule cannot be invoked absent a showing that the witness was not equally available to both parties. See State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992). This last requirement means that it must not be likely that the witness will be as favorable to one party as to the other. DAVID LOUIS RAYBIN, TENNESSEE CRIMINAL LAW & PROCEDURE, § 30.64 at 142 (1985) (citing MCCORMICK, EVIDENCE § 272 (3d ed. 1984)).

In this case, Woolums clearly had knowledge of material facts in this case. The Murrays claimed that they were with Woolums in Gatlinburg, Tennessee when Don Hurt was murdered. Obviously, Woolums could have testified about whether this was true or not, thus, either crediting or discrediting the alibi. In addition, Woolums is Ms. Murray's half-sister and thus, clearly has a relationship

-52-

with the Murrays that would naturally incline her to favor them. Further, Woolums was available to the process of the court. In fact, James Murray's trial counsel acknowledged that even though Woolums was living in Kentucky, he could have declared her to be a material witness and followed the procedures to have her properly subpoenaed, but he simply failed to do so because he did not think that it was necessary. Finally, it is not likely that Woolums would have been inclined to be as favorable to the State as she would be to the Murrays.[20] Thus, the trial court properly gave the missing witness instruction.

## XV. JURY MISCONDUCT

Appellant James Murray contends that the jury engaged in misconduct because it only deliberated for two hours and ten minutes before returning a verdict. Mr. Murray acknowledges, however, that his position is directly contrary to the established law of this state. Indeed, this Court has stated numerous times that "[t]he length of a jury's deliberation has no bearing on the strength or correctness of [its] verdict or the validity of [its] verdict." State v. Gray, 960 S.W.2d 598, 605 (Tenn. Crim. App. 1997) (finding no misconduct when jury deliberated for only one hour). See also State v. Spafadina, 952 S.W.2d 444, 451 (Tenn. Crim. App. 1996) (forty-nine minute deliberation); State v. Caldwell, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983) (twenty-six minute deliberation); Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977) (ten minute deliberation). This issue has no merit.

---

[20]In addition, the record indicates that after she was listed as an alibi witness, Woolums moved to an unknown address with no telephone and trial counsel for James Murray was only able to contact Woolums through the efforts of the Murrays' daughter, Laderia. It is not likely that Laderia Murray would have been so accommodating to the State. Thus, it appears that not only was Woolums not "equally available" as that phrase in used as a term of art, but she was also not "equally available" in the literal meaning of the phrase.

# XVI. OMISSIONS IN THE RECORD

Appellant James Murray complains that there are twenty-nine separate instances in the record where the court reporter indicated that she could not hear what was occurring during a bench conference because of the position of the microphone. As a result, Mr. Murray agues that he was not able to prepare a record that is a "fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal."

It is not clear from his brief whether Mr. Murray is claiming that he is entitled to relief because of these omissions, whether he feels the need to justify his failure to provide this Court with a complete record, or whether he simply wants to bring these omissions to the attention of this Court. In any case, it is apparent that the omissions are not lengthy and at times they appear to consist of only a few words or a sentence. It does not appear that any of the omissions affected the recording of the nature of Mr. Murray's objections or the outcomes of the bench conferences. Further, Mr. Murray has failed to indicate how, or even if, he was prejudiced by the omissions. In short, Mr. Murray is not entitled to relief simply because these omissions occurred. See State v. Blaine M. Wright, No. 03C01-9410-CR-00388, 1995 WL 728535, at *10 (Tenn. Crim. App., Knoxville, Dec. 11, 1995) (stating that defendant was not entitled to relief when he failed to show how he was prejudiced by thirteen unintelligible portions of the record).

# XVII. SENTENCING

All three Appellants contend that the trial court erroneously sentenced them to longer terms than they deserve. Specifically, they argue that the trial court erred when it imposed consecutive sentences based on a finding that they were dangerous offenders.[21] Under Tennessee law, "[w]hen reviewing sentencing issues . . . including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (1997). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the appellant's statements, the nature and character of the offense, and the appellant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1997 & Supp. 1998); Ashby, 823 S.W.2d at 169. "The defendant has the burden of demonstrating that the sentence is improper." Id.

Consecutive sentencing is governed by Tennessee Code Annotated § 40-35-115. The trial court has the discretion to order consecutive sentencing if

---

[21]Marcie Murray also argues that the trial court erred when it enhanced her sentence under Tennessee Code Annotated § 40-35-114(4) based on a finding that the victim was particularly vulnerable. She argues that this is unfair because the court based its finding on the fact that Don Hurt had been drugged after the court had denied her the funding to hire an expert to disprove this conclusion. However, the record reveals that the court's use of this enhancement factor was also based on Don Hurt's physical disabilities that were caused by the prior attempt on his life on June 11, 1991. In any case, the trial court's denial of funding for an expert was correct. See Part X, supra.

it finds that one or more of the required statutory criteria exist.  <u>State v. Black</u>, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).  Further, the court is required to determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed;  (2) serve to protect the public from further criminal conduct by the offender;  and (3) are congruent with general principles of sentencing.  <u>State v. Wilkerson</u>, 905 S.W.2d 933, 939 (Tenn. 1995).  Because the record indicates that the trial court considered the sentencing principles and all relevant facts and circumstances, our review of Appellants' sentences is de novo with a presumption of correctness.

The trial court based its decision to order all three Appellants to serve their sentences for conspiracy consecutively to their sentences for first degree murder on a finding that they were all dangerous offenders.  Specifically, the trial court made the following findings:

> Each is properly characterized as a dangerous offender.  I've looked both at the statutory definition and find it to be applicable, but I've looked beyond that and make a finding based upon the facts, all the facts before the Court, first of all, just all the facts of the offense itself; the murder, the sustained, very sustained intent, elaborate planning, multiple efforts, obviously once the design was formed to kill the victim in the case, the three perpetrators were just going to continue that effort until they finally succeeded, which they ultimately did. Very cold-blooded, very calculated, and when you've got greed as the motive, then you've got a situation where there is always the potential for recurrence, and therein comes the protections, the need to protect the community or to protect the public from further offenses.

The court also found that consecutive sentences were appropriate based on evidence that Mr. Murray had secreted a razor blade in his prison cell in an apparent attempt to escape, that Ms. Murray had written a letter to her son telling him to assault Sharon Hurt's son and telling him how he could locate Leonard Rowe, that Ms. Murray had committed perjury during the trial, that Ms. Hurt had

committed perjury in her civil trial, and that Ms. Hurt had been in unlawful possession of a weapon on numerous occasions. In short, the court found that, with respect to all three Appellants, "that anything would have been done and would be done again by them for money."

Based on our de novo review of the record, we find that the trial court did not abuse its discretion when it imposed consecutive sentences. First, we agree with the trial court that Appellants are dangerous offenders. Their elaborate planning and multiple attempts to kill Don Hurt clearly indicate that they have no regard for human life and they have no hesitation in taking human life. Second, we agree with the trial court that there is evidence in the record which indicates that consecutive sentences are necessary in this case to protect the public from further criminal conduct. In addition to killing Don Hurt out of greed, Appellants have demonstrated an almost total disregard for the law by threatening the life of Rowe and his family, offering to bribe Gurley to testify falsely, and committing perjury. Further, the evidence introduced at trial indicates that rather than ever showing any remorse for what they had done, Appellants merely laughed about the murder. The trial court did not abuse its discretion in finding that the public needed protection from these people who would perform even the most cold-blooded acts for money. Third, even though the trial court made no express finding, we conclude in our de novo review that given the egregious nature of Appellants' offenses, the aggregate sentences are reasonably related to the severity of the crimes involved. As this Court has previously stated, if our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principals set out under the sentencing law, and that the trial court's

findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In short, Appellants have failed to demonstrate that the trial court's imposition of consecutive sentences was an abuse of discretion. This issue has no merit.

## XVIII. CUMULATIVE ERROR

Appellant Marcie Murray contends that she was denied a fair trial based on the cumulative error in this case. Ms. Murray is correct that the combination of multiple errors may necessitate the reversal of a conviction even if individual errors do not require relief. See State v. Brewer, 932 S.W.2d 1, 28 (Tenn. Crim. App. 1996). However, we have carefully reviewed the record in this case and considered the errors assigned by Ms. Murray, both individually and cumulatively, and have determined that none constitute prejudicial error requiring a reversal. This issue has no merit.

Accordingly, the judgement of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE

CONCUR:

_____
GARY R. WADE, PRESIDING JUDGE


_____
DAVID G. HAYES, JUDGE